"fraud, deceit, gross negligence, willful misconduct, or a wrongful taking by [Bayou Management]."

56. The terms of Bayou's Subscription Agreements were similarly uniform for the Bayou Hedge Fund Class member investors. For example, Bayou's Subscription Agreements also provided that the Subscription Agreement shall be governed by a uniform choice of law (Connecticut).

57. For example, plaintiff Broad-Bussel Family entered into a Subscription Agreement with Bayou on December 21, 2003. Broad-Bussel Family's Subscription Agreement provided for, among other things, the Broad-Bussel Family's initial investment of $1,000,000 in the Bayou Super Fund. In accordance with its obligations thereunder, on January 5, 2004, the Broad-Bussel Family made a $500,000 wire transfer to Citibank, credited as the Broad-Bussel Family's initial investment in the Bayou Super Fund. On January 8, 2004, the Broad-Bussel Family made a second $500,000 wire transfer to Citibank; that transfer was also credited as the Broad-Bussel Family's investment in the Bayou Super Fund.

58. After Citibank received monies from plaintiff Broad-Bussel Family and other Class members as investments in the Bayou Hedge Funds, defendant Bayou Management sent such investors a certificate that acknowledged the Class member's investment in the respective Bayou Hedge Fund.

59. During the Class Period, the Bayou Defendants sent members of the Class, including Plaintiffs, on a monthly basis Net Asset Valuations that purported to accurately reflect Class members' contributions, withdrawals, and profits and losses for their investments in the Bayou Hedge Funds. However, all such Net Asset Valuation statements were false and

misleading because they did not reflect Class members' true financial interests in the Bayou Hedge Funds and did not accurately portray the Bayou Hedge Funds' true financial position and results. Moreover, such Net Asset Valuation statements were also false because they omitted to disclose, among other things, the massive trading losses that were being incurred by the Bayou Hedge Funds, the true asset valuation of the Bayou Hedge Funds, and the fact that the Bayou Defendants were unlawfully and secretly converting and otherwise dissipating -- indeed, outright stealing -- millions of dollars of Class member funds.

60. In disseminating the false monthly asset valuations, the Bayou Defendants' *modus operandi* was to similarly mislead all Class member investors into believing that their investment funds were being properly maintained and invested when, in fact, the opposite was true. Moreover, and throughout the Class Period, the Bayou Defendants also communicated financial and other information about Bayou and the Bayou Hedge Funds to the Class via weekly newsletters, monthly reports, quarterly reports, annual reports and investor conference calls, all of which similarly omitted material adverse information about Bayou and the Bayou Hedge Funds in order to mislead Class member investors into believing the Bayou Hedge Funds were being operated properly and in accordance with the law.

61. During the Class Period, the Bayou Defendants represented to the Class that independent financial audits of Bayou and the Bayou Hedge Funds were properly and timely being conducted. In certain instances, the Bayou Defendants even requested Class members to assist in those so-called independent audits.

62. For example, on or about February 14, 2004, defendant Israel sent plaintiff Broad-Bussel Family a confirmation letter stating that Bayou's auditors were engaged in an

examination of Bayou's financial statements and thus wanted to confirm material information covering investor capital accounts. The confirmation letter reflected the $1,000,000 investment that the Broad-Bussel Family made in January 2004. The letter requested that the Broad-Bussel Family confirm the contribution information directly to Bayou's auditor, defendant Richmond-Fairfield.

63. However, contrary to the Bayou Defendants' representations, the Bayou Hedge Funds were not being independently audited during the Class Period. The Bayou Defendants omitted to disclose that no audits of the Bayou Hedge Funds were being performed and that Richmond-Fairfield, the purported auditor, was not independent but was simply a sham company set up by defendant Marino.

64. On or about July 27, 2005, defendant Israel sent Class member investors, including Plaintiffs, a letter that abruptly announced that the Bayou Hedge Funds would be closed at the end of July 2005. In that letter, Israel made false assurances that, among other things, "[u]pon completion of the final audit, all investors will receive a 100% payout of their investments", and that Bayou would "send updates to the investors while the audit is in progress indicating an anticipated date of final payments." Israel also falsely praised Bayou's financial and fiduciary performance for its investors, stating specifically that "I feel we have done an admirable job in the stewardship of the funds with which we have been entrusted and hope that you agree."

65. On or about July 29, 2005, defendant Israel sent Class member investors, including Plaintiffs, a letter stating that the process of liquidating the Bayou Hedge Funds requires an auditing and closing process that could take four months or even longer. However,

the letter stated that at least partial distributions of Class members' investments could begin by mid-August 2005. That letter also falsely assured investors that "the final results [and resulting distribution] will not be materially different from the information furnished to you in your June [2005] statement."

66. In or about August 2005, Bayou Management sent Class member investors, including Plaintiffs, a final Net Asset Valuation statement for their investments in the Bayou Hedge Funds.

67. On or about August 2, 2005, defendant Israel sent members of the Class, including Plaintiffs, a letter dated that same day falsely stating that "[t]he auditors are now conducting the final audit of the Bayou Family of Funds." Those letters also included investment information regarding Class members' Bayou investments and requested that Class members confirm the investment information using a self-addressed enclosed envelope. That envelope was addressed to "Richmond-Fairfield Associates, 575 Madison Avenue, Suite 1006, New York, NY 10022-2511".

68. On or about August 11, 2005, defendant Israel sent members of the Class, including Plaintiffs, a letter stating that it planned to distribute 90% of the proceeds from the liquidation to investors beginning on August 17, 2005. As with the other prior specific communications set forth above, this letter was materially false and misleading because, among other things, Bayou had no intention of properly making such distributions.

**The Truth Begins to be Revealed**

69. On August 25, 2005 -- the close of the Class Period -- *The New York Times* shocked Class members and other investors by reporting that "[s]tate and federal officials in

Connecticut are investigating the possible collapse of the Bayou Group, a hedge fund and brokerage firm in Stamford that managed an estimated $400 million for its investors". The article reported that "[c]lients of the Bayou Group apparently grew concerned about the firm's status in recent days, when refund checks it had sent to customers could not be drawn upon for lack of funds".

70. On August 27, 2005, *The New York Post* reported that federal agents had seized boxes of records and other material from Bayou's offices in Stamford, Connecticut, amid fears that up to $500 million of its investors' money has "disappeared". Reportedly, witnesses said that those Bayou offices had employed some 15 to 20 people; however, by the time of the raid, the offices had been stripped bare of their contents and had actually been vacant for weeks. The article also reported that "[n]early everyone involved with Bayou Securities LLC has vanished - including its founder, Samuel Israel III ... [a]nd those who could be found aren't talking."

71. On August 29, 2005, *The Wall Street Journal* reported that a "suicide note and confession" had been found at offices of defendant Bayou Management. That suicide note/confession was supposedly written by defendant Marino, directly implicated defendants Marino, Israel and Marquez, and consisted of a six-page account of some of the details of financial fraud that had been conducted by the Bayou Defendants beginning in 1996 (the "Marino Confession"). It was reported that Eric Dillon, a money manager for Silver Creek Capital LLC in Seattle, Washington, had found the Marino Confession on August 16, 2005 and that federal and local authorities had commenced investigations regarding the Bayou fraud based in part on the Marino Confession.

72. As reported in *The Wall Street Journal* on the August 29, 2005, the Marino Confession begins with the statement, "This is my suicide note and confession", and went on to make numerous shocking revelations including, among others:

a. On the last trading day in December 1998, defendant Israel held a frantic meeting with defendants Marino and Marquez. Marino recalled that all three men knew Bayou's situation was dire -- in that the Bayou Hedge Funds' losses had vastly overwhelmed their gains for at least more than two years. In addition, Marino recalled that just three months earlier, another hedge fund known as Long-Term Capital Management had collapsed, causing widespread disruption in the financial world. Marino summed up the situation in plain words: "Something had to be done, and fast."

b. According to Marino, the solution, devised by Israel and Marquez, was simple: produce a fake audit of the funds' performance, and try to make up the losses the following year. The plan to recoup Bayou's past trading losses, as outlined by Marino, involved two steps. First, Israel would raise fresh funds from investors and trade his way to outsized gains on that money. Second, at least part of the commissions generated by the Bayou Hedge Funds' trades -- which were executed by Israel's own brokerage firm, defendant Bayou Securities -- would be credited back to the Bayou Hedge Funds to help offset and hide the losses. Those commissions were substantial given defendant Israel's daily "rapid-fire trading" activity. However, in order to engage in such a blatant fraud, the defendants determined that the existing outside auditor, Grant Thornton LLP, would need to be replaced by a newly-created bogus accounting firm – defendant Richmond-Fairfield.

c. Defendants Israel, Marino and Marquez then quickly implemented their fraudulent plan. With that plan in place, Bayou falsely reported its 1998 performance to investors as representing a gain of 17.55%, with December 1998 being touted as an especially good month, showing a profit of 3.14%.

73. For a period of time, the Bayou Defendants' Ponzi scheme provided significant cash flow from Bayou's new investors. Defendants Israel and Marino used significant amounts of that cash flow to fund their own extravagant life styles. For example, by 2003, defendant Marino, who had previously been driving a used Maxima and living at his mother's house in Staten Island, began driving Bentley and Ferrari automobiles and moved to a six-bedroom home in Westport, Connecticut acquired for some $2.9 million -- which he paid for in large part with Class member investors' cash. Similarly, that same year, defendant Israel, who was then in the midst of a marital divorce, moved into a luxury estate that had originally been built for ketchup magnate H.J. Heinz -- at a cost of $32,000 per month, again subsidized or largely paid by Class member investors' cash.

74. During the Class Period, defendants Israel and Marino created entities that were used to unlawfully receive Class members' Bayou investor funds, and thereafter either converted those funds personally to their own use or invested those funds in other investments for their own personal interests. For example, Israel and Marino wrongfully funneled some $40 million to defendant IM Partners during the period in or about 2003 to 2004. In addition, defendants Israel and Marino converted significant portions of those proceeds for their own personal use, and invested other such proceeds for their own personal benefit in several other companies, including firms such as Kycos Ltd., Debit Direct Ltd., Adam Aircraft, GS Capital, Vectrix, and

other entities, despite knowing that these funds were beneficially owned by Class member investors. Similarly, Israel and Marino funneled other Bayou investor monies to defendant IMG which were likewise wrongfully converted and used to make additional private investments for the personal benefit of Israel and Marino. In fact, defendants Israel and Marino reportedly created defendants IM Partners and IMG for the express purpose of helping conceal and launder the assets they stole from Class members, and in fact used defendants IM Partners and IMG expressly for such purposes.

75. Over time, the Bayou Defendants' scheme began to unravel as new investments were outpaced by investment withdrawals, expenses, losses and unlawful conversions. In or about April 2004, the Bayou Defendants made a last-ditch effort to keep their scheme afloat. Without informing Plaintiffs or other Bayou investors, the Bayou Defendants then secretly stopped all securities trading and liquidated the Bayou Hedge Funds. At or about that same time, the Bayou Defendants then transferred the remaining proceeds of the Bayou Hedge Funds directly to defendant Israel, with the substantial assistance and direct participation of defendant Citibank.

**Citibank Wrongfully Distributes Bayou Hedge Funds**

76. Citibank aided and abetted the Bayou Defendants' fraud and other misconduct by distributing wrongfully to defendant Israel ***personally*** some $161 million of Class member investor proceeds in circumstances where Citibank knew and disregarded that such proceeds were fiduciary funds beneficially owned by Class member investors.

77. In or about April 2004 -- following the Bayou Defendants' liquidation of the Bayou Hedge Funds -- defendants Israel and Marino instructed Citibank to transfer $150 million

from the Bayou bank accounts held at the Citibank branch in Bronxville, NY. Israel and Marino wired those funds to a trading account at Barclay's Bank in London. Thereafter, Israel and Marino reportedly transferred the $150 million back to Bayou's Citibank accounts in Bronxville.

78. Following those initial transfers, Citibank then permitted defendant Israel to personally withdraw many millions of dollars of Class member investor funds, and transferred such funds to bank accounts individually owned by, and under the sole control of, defendant Israel. Indeed, according to a September 1, 2005 article in *The Wall Street Journal*, the Bayou Defendants reportedly emptied five Bayou accounts held by Citibank over the course of six days, withdrawing some $161 million. Four of those accounts held money for -- and, very significantly, ***explicitly and directly in the name of*** -- four specific Bayou Hedge Funds (Bayou Super Fund, Bayou No Leverage Fund, Bayou Affiliates Fund and Bayou Accredited Fund), and the fifth account held money directly in the name of Bayou Management.

79. Despite the fact that Citibank knew or disregarded that those monies were Bayou Class member investor funds, Citibank nevertheless permitted defendant Israel to personally withdraw and transfer those funds to accounts he himself alone owned and controlled. Specifically, on or about July 8, 2004, Citibank directly wired $120 million from Bayou's Citibank accounts in New York to one or more offshore bank accounts in defendant Israel's name personally at Deutsche Postbank in Hamburg, Germany. Other transfers of Class member investor funds from the Citibank accounts, including an additional $32 million wire transfer reportedly somewhere within the United States, are unaccounted for.

80. Citibank knew or disregarded that it was holding the Bayou fund proceeds for the benefit of the Bayou Class member investors. In fact, Citibank knew as of the time the Bayou

Defendants established these accounts that such accounts included Class member fiduciary investment dollars. Moreover, that Citibank understood clearly that it was holding fiduciary proceeds beneficially owned by Class member investors is confirmed further by the fact that many Class members originally invested in the Bayou Hedge Funds by making ***wire transfers and other deposits directly to Citibank.*** Indeed, according to the Wire Transfer Instructions supplied by Citibank in connection with Bayou Hedge Fund investments, such funds were to be held and maintained in the names of the Bayou Hedge Funds. For example, the Wire Transfer Instructions supplied by Citibank for plaintiff Broad-Bussel Family directed that Broad-Bussel Family wire transfer its investment for the Bayou Super Fund directly to Citibank NA, 95 Pondfield Road Br 165, Bronxville, New York 10708. Those wiring instructions also provided the specific ABA number and bank account number for the Citibank account; the account name specified by Citibank was "Bayou Management, L.L.C. Special Account as agent for Bayou Superfund LLC"; and the wire transfer to Citibank included "Reference: Broad-Bussel Family L.P.".

81. In allowing wrongfully defendant Israel in or about July 2004 to personally misappropriate Class member investor funds from the Bayou accounts Class members beneficially owned, Citibank also knew, among other things, that:

a. defendant Israel and the other Bayou Defendants were essentially making an abrupt and wholesale withdrawal of Bayou Class member investor funds held by Citibank;

b. the funds being withdrawn were funds held by Citibank as a fiduciary for the benefit of Plaintiffs and the members of the Class who invested in the Bayou Hedge Funds; and

c. the fiduciary funds being withdrawn were being transferred to a foreign bank account and were being deposited, not in the name of the Bayou Hedge Funds, Bayou or even any Bayou-related entity, but in fact wrongfully into one or more of defendant Israel's own individual accounts.

82. At a very minimum, Citibank negligently permitted Israel to personally withdraw proceeds it knew or disregarded were beneficially owned by Class member investors. Moreover, defendant Citibank's acts in transferring at least $120 million directly to accounts wholly owned by, and personally in the name of, defendant Israel were particularly inexcusable in the circumstances here given that Citibank had received directly from Class members many millions of dollars in proceeds earmarked for investment in the Bayou Hedge Funds and, hence, knew or disregarded that such proceeds were fiduciary funds beneficially owned by Class member investors.

## Laundering of Converted Proceeds

83. After draining the Bayou bank accounts, Israel and Marino began a series of additional covert transactions aimed at laundering the $161 million by transferring those monies through bank accounts in financial institutions around the world, including New York, London, Germany, Hong Kong, Pennsylvania and New Jersey. Ostensibly, the transactions were purported to relate to legitimate private placement programs, which were to produce "above average returns -- and in some cases, 100% per week". In reality, however, the funds being transferred by Israel and Marino were part of an elaborate scheme to unlawfully launder the remaining assets of the Bayou Hedge Funds through several financial institutions in connection with their illegal conversion of those monies.

84. In May 2005, the Arizona Attorney General seized $101 million from several Wachovia Bank accounts in Flemington, New Jersey. In an August 30, 2005 press release, the Arizona Attorney General stated that the assets had been seized "after an investigation indicated the funds might be involved in a complex financial fraud". Since the seizure of the $101 million from Wachovia by the Arizona Attorney General in May 2005, defendants Israel and Bayou Management have filed claims for those monies with the Arizona Superior Court.

85. On September 29, 2005, defendants Israel and Marino both pleaded guilty to felony criminal charges that they "defrauded investors in the recently collapsed Bayou group of hedge funds of more than $450 million." In pleading guilty to the multiple-count felony informations filed by the United States Attorney in Manhattan:

a. Defendant Israel admitted "that he conspired with MARINO, the 45-year-old Chief Financial Officer and Chief Operating Officer of Bayou, to defraud investors by creating false financial statements that were distributed to investors", and that "between 1996, when the funds were set up, and 2005, when the funds collapsed, the funds sustained consistent losses, but, at his direction, investors were regularly told that the funds were reaping substantial gains."

b. Defendant Marino admitted "that he and ISRAEL, along with another former employee and co-founder of the Bayou Funds, hatched the scheme after the funds began sustaining losses. At the time, the three agreed that MARINO, a Certified Public Accountant, would form a sham certified public accounting firm named Richmond-Fairfield Associates, to sign off on the false financial statements showing fake profits that were used to lure future and current investors."

c. Defendant Israel pleaded guilty to criminal conspiracy, mail fraud and investment advisor fraud. Defendant Marino pleaded guilty to conspiracy, mail fraud, wire fraud and investment advisor fraud. As a result, each defendant faces a possible sentence of 30 years in prison. In addition, both defendants also face fines on each count of $250,000 or twice the gain or loss resulting from the crime; an order of restitution; and forfeiture of the proceeds of their admitted fraudulent scheme, among other things, including by the U.S. Attorney's office for the Southern District of New York. Reportedly, defendants Israel and Marino are scheduled to be sentenced for their crimes on April 10, 2006.

**Bayou Defendants' Material Misrepresentations and Omissions**

86. During the Class Period, the Bayou Defendants made numerous material misrepresentations and omissions regarding the financial results, operations and conditions and the business practices of the Bayou Hedge Funds (the "Misrepresentations and Omissions"). The Bayou Defendants' Misrepresentations and Omissions were made as part of a consistent, uniform scheme to all members of the Class. The Bayou Defendants' Misrepresentations and Omissions include, among others, the following:

a. The Bayou Defendants reported fictitious rates of return for the Bayou Hedge Funds in quarterly reports and mailed those reports to members of the Class.

b. The Bayou Defendants reported fictitious rates of return for the Bayou Hedge Funds in weekly newsletters and e-mailed or faxed those newsletters to members of the Class.

c. The Bayou Defendants reported individual investors' inflated accumulated profits in monthly reports and mailed those reports to members of the Class.

d. The Bayou Defendants mailed annual financial statements to members of the Class that contained, among other misrepresentations: (i) inflated rates of return on trading; (ii) inflated net asset values, and (iii) false certifications that Bayou had been independently audited by a certified public accounting firm, defendant Richmond-Fairfield.

e. The Bayou Defendants falsely told investors that the Bayou Hedge Funds were properly audited. In fact, beginning in or about early 1999, the Bayou Defendants created the phony accounting firm Richmond-Fairfield Associates and, contrary to the Bayou Defendants' representations, neither Richmond-Fairfield nor anyone else conducted independent audits of the Bayou Hedge Funds during the Class Period.

f. The Bayou Defendants omitted to disclose the true financial results and conditions of the Bayou Hedge Funds and the true net asset valuations for Class members' investments in the Bayou Hedge Funds, as well as the facts that the Bayou Hedge Funds were not being independently audited, that Richmond-Fairfield was a sham company, and that the reported results of the Bayou Hedge Funds were wholly fictitious.

g. The Bayou Defendants also omitted to disclose that in or about the spring of 2004, the Bayou Defendants ceased all trading for the Bayou Hedge Funds, liquidated all investments in the Bayou Hedge Funds, and withdrew all of the remaining monies from the Bayou Hedge Funds' bank accounts at Citibank, without being authorized to do so and without informing -- but instead affirmatively and fraudulently concealing their scheme from -- the members of the Class. For its part, moreover, Citibank knew or disregarded that the proceeds it transferred to defendant Israel's offshore accounts personally were in fact Class member

fiduciary investment dollars, but nevertheless enabled Israel to misappropriate such proceeds through its own wrongful acts and omissions.

h. The Bayou Defendants omitted to disclose that between in or about the fall of 2003 and in or about May 2005, the Bayou Defendants entered and attempted to enter into private financial transactions using money from the Bayou Hedge Funds without authorization and without disclosing to Class member investors the nature of those transactions.

i. The Bayou Defendants also omitted to disclose that from in or about July 1996 through in or about August 2005, the Bayou Defendants fraudulently induced members of the Class to contribute in excess of $450 million to the Bayou Hedge Funds and the Bayou Defendants then wrongfully converted significant portions of those monies for their own personal use.

87. As one specific example of the Bayou Defendants' misstatements, the Bayou Defendants told investors that the purported "audited" financial statements of the Bayou Super Fund for the year ended December 31, 2003 reported fund assets of approximately $192 million and a net trading gain of some $27 million. In truth, however, the Bayou Defendants omitted to disclose that the Bayou Super Fund actually had less than $54 million in fund assets for year end 2003 -- not even one-third of the falsely reported value -- and had not experienced a trading gain, but instead had suffered a loss of $35 million.

88. The reports created and distributed by the Bayou Defendants during the Class Period were materially false and also violated numerous of the most basic tenets of GAAP, including but not limited to the following:

a. that revenue can only be recognized if the revenue has been earned and is collectible (CON 5, ¶ 83);

b. that financial reporting should provide information that is useful to present and potential investors, creditors, and other users in making rational investment, credit, and similar decisions (CON 1, ¶ 34);

c. that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON 1, ¶ 40);

d. that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (CON 1, ¶ 50);

e. that financial reporting should provide information about an enterprise's financial performance during a period (CON 1, ¶ 42);

f. that financial reporting should be relevant and reliable in that it represents what it purports to represent -- a notion that is central to accounting (CON 2, ¶¶ 58-59); and

g. that financial reporting should be complete, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON 2, ¶ 79).

**The Hennessee Defendants Improperly Investigate**
**<u>and Recommend the Bayou Hedge Funds</u>**

89. The Hennessee Defendants held themselves out to plaintiff Broad-Bussel Family, the Hennessee Subclass and the investing community generally as highly experienced and competent experts, even self-proclaimed "pioneers", in hedge fund consulting.

90. For example, the Hennessee Group website posted an open letter to investors, signed by defendants Lee Hennessee and Gradante, which states in pertinent part (emphasis altered):

> [W]e are committed to a singular mission: achieving the investment goals of our clients by applying the expertise, creativity and commitment of our people.
>
> The investor is our client. ***Our clients trust us to establish realistic investment objectives and develop diversified hedge fund portfolios. To achieve these goals, we apply our time tested advisory processes and proprietary research tools.***
>
> ***We are "your strategic partner" in hedge fund investing.***
>
> Sincerely,
>
> E. Lee Hennessee and Charles J. Gradante[.]

91. The Hennessee Group website further boasted that (emphasis added):

> Since the beginning, we have been navigating a course of action that balances risk and return among a well diversified hedge fund portfolio. ***We have the expertise and experience*** to provide clients with a range of investment advisory services, which integrates portfolio size, objectives and suitability.

92. The Hennessee Group also touted its services specifically to plaintiff Broad-Bussel Family and the members of the Hennessee Subclass based on the supposedly superior research, due diligence and monitoring services that it provides (emphasis altered):

> In order to understand your portfolio's performance, you need to see more than just returns; you should be able to understand how the returns were achieved and what factors affected them.
>
> ***We provide clients with various research tools:***
>
> *Performance analytics*
> *Comparative analyses*
> *Manager newsletters and interviews*

*Risk assessments*
*Due diligence reports*
*Monthly client statement "monitors".*

93. The Hennessee Defendants also touted publicly the value of the consulting and advisory services they provide to hedge fund investors. For example, defendant Gradante provided a written submission to the SEC in connection with a "Roundtable on Hedge Funds", held on or about May 14-15, 2003 in Washington, D.C. Among other things, Gradante claimed that hedge funds consultants, like the Hennessee Defendants, are "value added" in providing investors with guidance and advice:

> The value that hedge fund consultants provide is similar to the value consultants provide pensions, endowments, foundations, and government entities, which is fundamentally the analysis of the customer's investment needs and assistance in determining asset allocations, manager selection, and ongoing monitoring.

Gradante then also further espoused the "special value" of hedge fund consultants, such as the Hennessee Defendants, based on the unique characteristics of hedge fund investments, stating as follows:

- The hedge fund industry "is relatively difficult to learn about from public information."
- Because hedge funds are "less transparent" than other investments, consultants "can provide discernment about a strategy."
- "The instruments and strategies used by hedge funds can be generally more complex than what you find in traditional money management, so hedge fund consultants can be valued added in identifying inherent strategy risk."
- "Determinations about suitability and what is in the best interest of the client can be a difficult exercise without a consultant."

- Hedge fund consultants "provide professional expertise in evaluating investment opportunities".

94. The Hennessee Defendants, including specifically defendants Lee Hennessee and Gradante, told Broad-Bussel Family and other members of the Hennessee Subclass that the integrity, skill, expertise and fidelity of a hedge fund were factors critical to their recommending hedge fund investments. Moreover, defendants Lee Hennessee and Gradante marketed themselves personally to plaintiff Broad-Bussel Family and the Hennessee Subclass as being experts in analyzing fund managers and selecting appropriate hedge fund investments for their clients. Further defendants Lee Hennessee and Gradante personally solicited plaintiff Broad-Bussel Family and the members of the Hennessee Subclass to make investments in the Bayou Hedge Funds and personally purported to investigate Bayou for plaintiff Broad-Bussel Family and the members of the Hennessee Subclass, and the Hennessee Group was simply the alter ego of defendants Lee Hennessee and Gradante. Absent the purported reputation, skill and expertise of defendants Lee Hennessee and Gradante and their alleged experience in properly investigating hedge fund investments, plaintiff Broad-Bussel Family and members of the Hennessee Subclass would not have sought advisory services and hedge fund recommendations from the Hennessee Defendants.

95. The investment advisory agreements that the Hennessee Group entered into with members of the Hennessee Subclass included material terms that were uniform among the Bayou Hedge Fund Class member investors. For example, those investment advisory agreements obligated the Hennessee Group to perform due diligence investigations and ongoing monitoring of investments recommended by the Hennessee Group, including, among other things, as follows (emphasis added):

a. "*provid[e] advice* to Client concerning investments in one or more private investment partnerships (each a "Hedge Fund" and collectively, the "Portfolio'). These services include the initial selection of each Hedge Fund and *ongoing monitoring* of the performance of the Portfolio";

b. "*perform search, evaluation, selection, and introduction services* (collectively, "Structuring Services") and introduce Client to one or more Hedge Fund(s) that Hennessee *reasonably believes* would be appropriate investment vehicles for Client to use based upon the investment objectives of Client"; and

c. provide "Ongoing Services to the Client, such as its obligation to "*monitor* the performance of the Portfolio selected by Client and provide *continuous and ongoing* Hedge Fund investment advice".

96. By virtue of the Hennessee Defendants' superior knowledge and expertise, their representations to the members of the Hennessee Subclass, their roles in rendering financial and advisory services to the members of the Hennessee Subclass and their status as registered investment advisors with purportedly expert knowledge about the hedge fund industry, the Hennessee Defendants owed fiduciary and other duties to the members of the Hennessee Subclass. These duties included, among other things, the obligations to: investigate the business practices and financial condition of the investments they recommend; monitor those recommended investments which are made by their clients; render honest and properly investigated financial advice regarding investments by the members of the Hennessee Subclass; and assist Hennessee Subclass member investors in good faith in managing their investment funds.

97. In rendering their services to the Hennessee Subclass, the Hennessee Defendants recommended that members of the Hennessee Subclass invest in the Bayou Hedge Funds, even if

making such an investment required a withdrawal of funds from an existing investment previously recommended by the Hennessee Defendants or other parties. In response to and reliance upon such recommendations, plaintiff Broad-Bussel Family and the members of the Hennessee Subclass invested in the Bayou Hedge Funds.

98. In making these investment recommendations, the Hennessee Defendants provided the members of the Hennessee Subclass with false information regarding the Bayou Hedge Funds' purported financial results, operations and condition.

99. For example, the Hennessee Defendants touted the business model and operations of the Bayou Hedge Funds, including the Bayou Super Fund. The Hennessee Defendants also advised that the recommended Bayou Super Fund was a relatively liquid investment vehicle and that fund withdrawals can be made on a monthly basis simply with a 15 day advance notice. The Hennessee Defendants advised the Hennessee Subclass as to the total assets of that fund and that the personal investment commitment in that Fund by the portfolio manager, *e.g.*, defendants Bayou Management and Israel, was "Significant".

100. The Hennessee Defendants also advised the Hennessee Subclass that the Bayou Super Fund uses "a high velocity trading strategy, based on a proprietary model with constant human overlay". The Hennessee Defendants further explained that "[b]efore the markets open, the investment team formulates a trading strategy for the day based on news, SEC filings, insider activity, industry reports, etc." The Hennessee Defendants assured plaintiff Broad-Bussel Family and the members of the Hennessee Subclass in marketing materials that investment risk was controlled and monitored by Bayou Management, in that, among other things, "[long/short

investment] exposures are frequently brought down to zero by the closing bell, to prevent gap up/downs" and that "[t]he fund cuts back exposure if daily losses are in the 1% - 1.5% range."

101. The Hennessee Defendants represented to the Hennessee Subclass that the Bayou Super Fund was based on an "Opportunistic" style, a characterization which was defined by the Hennessee Defendants' marketing materials to mean:

> Long/short equities managers who maintain a flexible net exposure to reflect changing dynamics of the market on a minute-to-minute or daily day trading basis. Managers typically utilize technical and/or fundamental analysis. Portfolio turnover can be high as managers implement trading disciplines such as tight stop losses and defined exit target prices.

The Hennessee Defendants represented that the Bayou Super Fund had a "Low/Moderate" expected volatility.

102. The Hennessee Defendants also touted the historical financial performance of the Bayou Super Fund, providing non-publicly available monthly and annual investment returns for the years 1997 through 2003, including for example specifically as follows:

| Year | Investment Performance |
|---|---|
| 2003 | 10.66% |
| 2002 | 11.22% |
| 2001 | 7.05% |
| 2000 | 19.62% |
| 1999 | 26.06% |
| 1998 | 17.55% |
| 1997 | 32.52% |
| Annualized Compound Return (1997-2003) | 18.22%. |

103. The Hennessee Defendants also directly facilitated the Bayou investments of plaintiff Broad-Bussel Family and the members of the Hennessee Subclass. For example, the Hennessee Defendants' made direct requests to Bayou for Bayou offering documents on behalf of members of the Hennessee Subclass.

104. The Hennessee Defendants knew that the integrity, skill, expertise and fidelity of the Bayou Hedge Funds, their manager, Bayou Management, and its officers – including in particular defendant Israel – were critical to a proper due diligence analysis and recommendation of investments in the Bayou Hedge Funds.

105. Following the time the members of the Hennessee Subclass invested in the Bayou Hedge Funds, the Hennessee Defendants transmitted other false and misleading information, all of which omitted to disclosed adverse material facts about Bayou and the Bayou Hedge Funds, including as described more fully below.

**The "Red Flags" Regarding the Bayou Defendants' Misconduct**
**Which the Hennessee Defendants Missed or Ignored**

106. The members of the Hennessee Subclass relied on the expertise of the Hennessee Defendants to investigate, analyze and timely report material information regarding the Bayou Hedge Funds.

107. The Hennessee Defendants failed to conduct a proper due diligence review of the Bayou Hedge Funds, Bayou Management and Bayou's principal officers, including in particular, defendants Israel and Marino. Similarly, the Hennessee Defendants failed to properly monitor and advise members of the Hennessee Subclass concerning their investments in the Bayou Hedge Funds, despite the fact that plaintiff Broad-Bussel Family and other Hennessee Subclass member investors specifically retained them to perform properly such an investigation. In

failing to conduct proper due diligence reviews and ongoing monitoring of the Bayou Hedge Funds, Bayou Management and Bayou's principal officers, the Hennessee Defendants failed to uncover or ignored numerous "red flags" (the "Red Flags") that were either indicative of the Bayou Defendants' misconduct, or should have led the Hennessee Defendants to investigate further and timely communicate adverse information to the members of the Hennessee Subclass, examples of which include the following:

a. The Paul Westervelt Action: On or about March 26, 2003, Paul Westervelt, Jr. ("Westervelt") and his son, Paul Westervelt, III, filed a civil lawsuit in Louisiana federal court (No. 03-0860 (E.D. La.)) against defendants Israel, Marino, Bayou Management, Bayou Fund and Bayou Securities, alleging breach of contract, unjustified employment termination and violation of Louisiana's Whistleblower Statute, L.S.A.-R.S. 23:967 (the "Westervelt Action"). Westervelt alleged that he was hired in or about September 2002 to serve as a principal of Bayou in connection with hedge fund management. According to paragraph 13 of the Westervelt complaint, after being hired Westervelt "discovered what he perceived to be possible violations of S.E.C. regulations governing the operation of hedge funds, as well as other perceived possible violations of S.E.C. and N.A.S.D. rules and regulations." In addition, Westervelt allegedly "observed Marino engaged in [certain unspecified] conduct toward the other employees of Bayou on numerous occasions" that could "expose Bayou ... to potential civil liability." Westervelt, as a Bayou principal, requested that Israel and Marino provide him with access to "financial documentation relating to Bayou, including income statements, balance sheets, monthly account statements and other financial documents evidencing the ongoing business activities of Bayou"; in response, Israel and Marino denied those requests, and

reportedly "deliberately obstructed" Westervelt's attempts to access those requested documents. Nevertheless, Westervelt was able to obtain certain documentation which showed that (emphasis added):

> ***Bayou's capital trading account at Spear, Leeds & Kellogg ("Spear Leeds"), had been depleted by more than $7 million in December 2002. As evidenced by the December 2002 account statement ... Bayou's capital account at Spear Leeds had a balance of more than $7.8 million on December 1, 2002, and a balance of only $379,000 as of December 31, 2002 ....***

Although Westervelt repeatedly asked Israel and Marino to explain this capital account depletion, Westervelt never received any explanation or further information. Further, the Hennessee Defendants failed to alert its Class member investor clients to even the existence of these proceedings and allegations -- despite being hired for the very purpose of uncovering and advising its investor clients precisely concerning such types of Red Flags.

b. Bayou's Statement Regarding the Westervelt Action: On or about November 3, 2004, defendant Israel, in his capacity as the so-called General Partner of the Bayou Group, sent a letter to investors of the Bayou Hedge Funds to address the Westervelt Action. That letter was also sent to and/or received by the Hennessee Defendants. Israel's letter attempted to defuse any negative impact that had been created by the Westervelt Action by trying to discredit Westervelt personally and by denying all allegations of wrongdoing. For example, Israel claimed that Westervelt had been hired by Bayou because of Westervelt's "self-described deteriorating situation" with his prior employer; however, Westervelt alleged that he "agreed to leave his successful business arrangement" with his prior employer in exchange for Bayou's promise to pay him an annual salary of $800,000 and give him an immediate 25%

ownership in Bayou Management (Westervelt Complaint, ¶ IX). Also, Israel claimed that Westervelt was fired because he "would simply not follow the Bayou trading methods"; however, Westervelt alleged that he resigned essentially because he refused to participate in the illegal conduct being committed by Israel, Marino and the other Bayou defendants. Israel's letter also noted that another Bayou employee, Ray Oelkers ("Oelkers"), had also been fired by Israel and that Oelkers had also filed a lawsuit. Israel similarly insinuated that Oelkers needed a job, and that Israel hired Oelkers but then fired him because Oelkers refused to perform "[t]he duties and responsibilities of the position ... outlined for him" -- in other words, Oelkers refused to participate in the Bayou Defendants' fraud. In sum, such allegations and counter-allegations are precisely the type of information that the members of the Hennessee Subclass relied upon the Hennessee Defendants to investigate, uncover, analyze and, at a minimum, timely advise its client investors of.

c. Admitted Conflicts of Interests: Defendant Israel acted as the Chief Investment Officer, manager and head trader for the Bayou Hedge Funds. The securities brokerage and trading functions for the Bayou Hedge Funds were performed by Bayou Securities, which during the Class Period was owned by Israel. The Bayou Hedge Funds' proclaimed "trading strategy" consisted of daily, continual high-volume trading activity -- thus resulting in substantial corresponding commissions for Bayou Securities, and in turn substantial income personally for defendant Israel. In other words, the more that Israel churned, or turned-over, the stock portfolios of the Bayou Hedge Funds, the more commissions he would earn. In fact, according to the Marino Confession, in or about 1997 and 1998, the Bayou Defendants fraudulently funneled portions of their Bayou Securities' hefty commissions back to the Bayou

Hedge Funds to help conceal trading losses. As their fraud grew, the Bayou Defendants ceased funneling those commissions in or about 1998 and simply reported wholly fictitious financial results and balances for the Bayou Hedge Funds, with Israel still retaining personally substantial revenues from those commissions. Such false financial reports were made possible because the Bayou Defendants falsely reported that the data had been audited by an independent accounting firm, Richmond-Fairfield -- which in actuality was a bogus company that was created, owned and registered by defendant Marino, and which never properly performed, or even could perform, such audits.

d. Phoney Audit/Accounting Firm: Richmond-Fairfield was formed in or about 1998 by defendant Marino with the direct approval and participation of defendants Israel and Marquez. Richmond-Fairfield was formed specifically in order to help conceal the Bayou Defendants' expanding fraud. In fact, New York state regulatory filings show that the firm was not even registered with the state of New York, or any other state, until October 10, 2000. Moreover, those regulatory filings show that the owner of Richmond-Fairfield is Bayou's CFO, defendant Marino. As defendant Marino has admitted, the Bayou Defendants concocted this phoney accounting firm in order to facilitate their financial fraud. Among other things, the phoney firm provided false audit opinions that certified that Bayou's financial statements, reported profits, and fund valuations were fairly stated and had been prepared in accordance with GAAP.

e. Complete Absence of Verification: The Hennessee Defendants did not obtain any independent verification or confirmation as to the Bayou Hedge Funds' asset balances or securities transactions. Absent such verification or confirmation, the Hennessee Defendants

could not have performed any reasonable or meaningful due diligence or monitoring of Bayou or the Bayou Hedge Funds. At a very minimum, the lack of any such verification or confirmation should have caused the Hennessee Defendants to further investigate and advise plaintiff Broad-Bussel Family and members of the Hennessee Subclass that the Hennessee Defendants did not obtain such verification or confirmation, and that they therefore had not performed any meaningful due diligence and monitoring of the Bayou Hedge Funds. Nevertheless, plaintiff Broad-Bussel Family and the members of the Hennessee Subclass invested in Bayou based upon the Hennessee Defendants' recommendations and in reliance on the Hennessee Defendants' reputation, skill and purported investigation of Bayou.

f. Bayou Used Paid Promoters: According to materials provided to the Hennessee Defendants by Bayou during the Class Period, Bayou acknowledged that it retained several outside marketers and promoters for the Bayou Hedge Funds and paid those persons based either on a percentage of assets raised or through commissions to the promoters' designated brokers/dealers. These practices created clear conflicts of interest, but the Hennessee Defendants failed to investigate properly and advise the members of the Hennessee Subclass. These paid promoters included, among others, Aris Partners, Altegris Investments and Consulting Services Group, some or all of whom reportedly received as much as 3% of the assets they raised.

g. Israel's Falsified Resume: The Bayou Defendants falsified and materially embellished the professional credentials and biographical information regarding defendant Israel -- the manager and Chief Investment Officer of the Bayou Hedge Funds. Indeed, there are several material discrepancies between Israel's *curriculum vitae* that was included in the Bayou

Group's marketing materials for the Bayou Hedge Funds, which was received by the Hennessee Defendants, as compared to the C.R.D. that was on file with securities regulators.[5] For example, the biography Israel used to help market the Bayou Hedge Funds to investors omits several of his prior employers and his history of bouncing from one brokerage firm to another, and falsely stated that Israel had been a head trader at the respected hedge fund Omega Advisors and exaggerated the period of time that Israel worked for that entity.

h. Bayou's Falsified Company History: The Bayou Defendants also falsified the history of Bayou and the Bayou Hedge Funds. These falsified data were used to distort Bayou's true operating history in order to gloss over and conceal Bayou's track record of poor performance. For example, the Bayou Defendants gave prospective investors, including members of the Class, documents that falsely stated that defendant Israel started the Bayou funds in 1997. In fact, the Bayou funds actually began in 1996. However, Israel and Bayou had delivered such a poor performance prior to 1997 that the Bayou Defendants simply blotted out the 1996 operations entirely from Bayou's reported history.

i. Prior Regulatory Violation and Fine: On September 10, 2003, the Connecticut Banking Commissioner entered a Consent Order with respect to Bayou Securities. The Consent Order stated that Bayou Securities, a Connecticut-registered broker-dealer, failed to keep the records required by Section 36b-31-14a(a) of the Regulations under the Connecticut Uniform Securities Act. The Consent Order required that Bayou Securities pay $7,500 to the department as an administrative fine and provide the Securities and Business Investments Division with copies of any customer complaints on a quarterly basis for two years.

[5] C.R.D. is a regulatory filing maintained by the NASD that reports the qualification, employment and disclosure histories of registered securities employees of NASD member firms.

j. Unusually Favorable Fees and Restrictions: Bayou offered unusually favorable fees and terms for the Bayou Hedge Funds, which successfully served as enticements for investors, including members of the Class, to choose the Bayou Hedge Funds over other hedge funds. Indeed, according to the Marino Confession, such favorable terms were used precisely to induce Class member investments. For example, unlike most hedge funds, Bayou did not charge investors the traditional hedge fund management fee of 1% to 2% of the investment assets, plus a percentage of the gains the fund realizes. Instead, Bayou claimed to limit its fees to 20% of the funds' gains. However, in actuality, this meant that the more fictitious gains Bayou reported, the larger Bayou's fees. In addition, the minimum investment Bayou required of its investors was $250,000 -- an amount that was much smaller than the $1 million minimum used by other funds. Also, Bayou did not have a long "lockup" period -- meaning that investors could enter and exit the Bayou Hedge Funds on a monthly basis, as opposed to lock-up periods of a year or more that are commonly used by other hedge funds.

108. The Hennessee Defendants were obligated to reasonably investigate the operations, finances and history of the Bayou Hedge Funds that they recommended to the plaintiff Broad-Bussel Family and the Hennessee Subclass. Indeed, they were hired and paid by plaintiff Broad-Bussel Family and the Hennessee Subclass expressly for this purpose. Additionally, after plaintiff Broad-Bussel Family and members of the Hennessee Subclass invested in the Bayou Hedge Funds, the Hennessee Defendants were required to monitor such investments and advise promptly plaintiff Broad-Bussel Family and the members of the Hennessee Subclass of any material information concerning same and whether circumstances had materially changed regarding such investments. In fact, plaintiff Broad-Bussel Family and

the members of the Hennessee Subclass retained and paid the Hennessee Defendants not only to advise them regarding the initial investments, but also to timely advise them of any events or changes thereafter so that they could make informed decisions regarding their investments.

109. In addition to the foregoing Red Flags, the Hennessee Defendants also had the ability to inspect the books and records of the Bayou Hedge Funds. Indeed, an inspection of such records should be part of any reasonable investigation for which plaintiff Broad-Bussel Family and the other members of the Hennessee Subclass retained and paid the Hennessee Defendants. For example, the respective Operating Agreements governing Class member investments in the Bayou Hedge Funds provided as follows:

> The books and records shall at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, Economic Owners, or their duly authorized representatives during reasonable business hours.

110. The Hennessee Defendants failed to inspect the books and records of the Bayou Hedge Funds altogether, or at least to do so in a proper manner, and to timely advise members of the Hennessee Subclass as to material adverse information concerning Bayou and the Bayou Hedge Funds.

111. The Hennessee Defendants wrongfully ignored or failed to uncover the foregoing Red Flags in recommending that the members of the Hennessee Subclass invest in the Bayou. Hedge Funds. Had the Hennessee Defendants conducted proper due diligence and monitoring, they would have learned the truth about Bayou or further investigated and alerted members of the Hennessee Subclass to reject investing in the Bayou Hedge Funds or to withdraw their investments in the Bayou Hedge Funds, thus preventing or mitigating the damages that were

ultimately suffered by plaintiff Broad-Bussel Family and the Hennessee Subclass when the Bayou Hedge Funds collapsed in or about July 2005.

**Piercing the Corporate Veil**

112. Defendants Israel and Marino acted in concert with, dominated and otherwise controlled the operations of Bayou Group, Bayou Management, Bayou Securities, Bayou Partners, Bayou Advisors, Bayou Equities, Bayou Super Fund, Bayou No Leverage Fund, Bayou Affiliates Fund, Bayou Accredited Fund, Bayou Offshore Fund, Bayou Offshore Fund A, Bayou Offshore Fund B, Bayou Offshore Fund C, Bayou Offshore Fund D, Bayou Offshore Fund E, Bayou Offshore Fund F, Bayou Offshore Master Fund, Bayou Fund, Richmond-Fairfield, IM Partners and IMG (collectively, the "Bayou Dominated Entities"). In addition, defendants Israel and Marino planned, orchestrated and executed the wrongdoing as alleged on behalf of themselves individually and through the Bayou Dominated Entities, which Israel and Marino controlled and operated for their own personal benefit and as their own alter egos. Among other things, defendants Israel and Marino completely dominated and controlled the Bayou Dominated Entities (particularly with respect to the Misrepresentations and Omissions regarding Class member investor funds and the misappropriation and other dissipation of the Bayou Hedge Funds). Israel and Marino exercised that domination and control to facilitate and enable the alleged fraud and other misconduct that resulted in the damages suffered by Plaintiffs and the Class. Accordingly, the acts and omissions of each of the Dominated Entities should be attributed to one another and to defendants Israel and Marino personally.

113. Defendants Lee Hennessee and Gradante acted in concert with, dominated and otherwise controlled the operations of the Hennessee Group (the "Hennessee Dominated

Entity"). In addition, defendants Lee Hennessee and Gradante planned, orchestrated and executed the wrongdoing as alleged on behalf of themselves individually and through the Hennessee Dominated Entity, which Lee Hennessee and Gradante controlled and operated for their own personal benefit and as their own alter ego. Among other things, defendants Lee Hennessee and Gradante completely dominated and controlled the Hennessee Dominated Entity (particularly with respect to the failure to perform proper due diligence and monitoring of the Bayou Hedge Funds). Lee Hennessee and Gradante exercised that domination and control in connection with the Hennessee Group's misconduct that resulted in the damages suffered by plaintiff Broad-Bussel Family and the Hennessee Subclass. Accordingly, the acts and omissions of the Hennessee Dominated Entity should be attributed to defendants Lee Hennessee and Gradante personally.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(For Fraud Against the Bayou Defendants)**

114. Plaintiffs and the Class reallege each of the foregoing allegations as if fully set forth herein.

115. Plaintiffs and the Class bring this claim for fraud against the Bayou Defendants.

116. During the Class Period, the Bayou Defendants made numerous and continuing material misrepresentations and omissions regarding the financial results, operations and conditions and the business practices of the Bayou Hedge Funds. Among other things, as alleged above, the Bayou Defendants' Misrepresentations and Omissions included issuing false reports of the Bayou Hedge Funds' rates of return and total value; false reports of Class