USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────x

IN RE BAYOU HEDGE FUND INVESTMENT
LITIGATION
────────────────────────────────x

THIS DOCUMENT RELATES TO:
────────────────────────────────x

BROAD-BUSSEL FAMILY LIMITED
PARTNERSHIP, MARIE LOUISE
MICHELSOHN, MICHELLE MICHELSOHN AND
HERBERT BLAINE LAWSON, JR., individually
and on behalf of all other persons and entities
similarly situated,

        Plaintiffs,

-against-

BAYOU GROUP LLC, et al.,

        Defendants.
────────────────────────────────x

MDL No. 1755 (CM)

06 Civ. 3026 (CM)(MDF)

## MEMORANDUM DECISION AND ORDER GRANTING CITIBANK'S MOTION TO DISMISS THE COMPLAINT

McMahon, J.:

    Defendant Citibank, NA, moves for dismissal of this putative class action complaint as against it.

    Plaintiffs and the class they purport to represent were victims of the collapse of the Bayou Family of hedge funds, which were fraudulently run by Samuel Israel III and Daniel E. Marino. Fearing that the sums so far recovered from Bayou will prove insufficient to cover losses suffered by thousands of defrauded investors, the class plaintiffs have cast about for potential deep pockets to sue. High on their list is Citibank, NA.

    Citibank was the bank at which some of the Bayou entities maintained bank accounts. Plaintiffs allege that Citibank, beginning in July 2004, processed wire transfers in which money on deposit in Bayou-related accounts was moved to private accounts in Germany controlled by Israel. (Am. Cplt. ¶ 3). Plaintiffs accuse Citibank of negligence, commercial bad faith, aiding and

abetting fraud, aiding and abetting a breach of fiduciary duty, aiding and abetting negligence and unjust enrichment. (See Am. Cplt. Counts VII, VIII, XII, XIII, XIV and XV).

Similar allegations – albeit in a radically different factual context – were the subject of a recent decision by the United States Court of Appeals for the Second Circuit. See Lerner v. Fleet Bank, N.A. et al., No 05-5106-cv, 2006 WL 2260822 (2d Cir. Aug. 8, 2006) (hereinafter Lerner II). After Lerner II – where the facts alleged were far more favorable to the plaintiffs' claims – it is clear that the counts aiding and abetting fraud and commercial bad faith cannot withstand this motion to dismiss. The question is whether plaintiffs' claims of negligence, aiding and abetting a breach of fiduciary duty and unjust enrichment survive.

Because of critical differences between the facts here pleaded and the facts of Lerner II and other relevant cases, I conclude that these counts, too, must be dismissed.

*The Well-Pleaded Allegations of the Complaint*

For purposes of this motion to dismiss, I assume the well-pleaded allegations of the complaint to be true and draw all inferences in favor of plaintiffs.

Plaintiffs were investors in the various Bayou hedge funds, a family of funds based in Connecticut whose principals were Messers Israel and Marino.

In August 2005, the principals announced that they were closing the Funds. Both Israel and Marino have pled guilty to criminal charges in connection with the collapse of the Funds.

Citibank is a national bank headquartered in New York City. Prior to July 2004, Citibank held a number of deposit accounts for Bayou Depositors at a branch bank in Bronxville, New York. The complaint does not specifically identify which Bayou defendants had accounts at Citibank or plead any facts about those accounts. It does assert, in conclusory fashion, that Citibank "received millions of investment dollars from Class members it knew were fiduciary proceeds beneficially owned by the Class." (Am Cplt. ¶3). From this one can draw the conclusion that persons who invested funds in Bayou got those funds to Bayou by depositing or wiring them to a Bayou account at Citibank, in the expectation that Bayou would be investing those funds on the clients' behalf.

Broad-Bussel, one of the putative class plaintiffs in this action, alleges that it entered into a subscription agreement with Bayou on December 21, 2003, pursuant to which it agreed to make an initial investment of $1 million in the Bayou Super Fund. In accordance with the agreement, Broad-Bussel wired $500,000 to Citibank on January 5, 2004. These wire transfers were allegedly credited as "investment in the Bayou Super Fund." (Am. Cplt ¶ 57). After Citibank received these funds, class members received acknowledgment that they had made an investment in a Bayou hedge fund. (Am. Cplt. ¶ 58). It is not alleged that Citibank sent the acknowledgment.

The amended complaint alleges that Citibank "aided and abetted the Bayou Defendants' fraud and other misconduct" by wrongfully distributing $161 million in class member funds to Israel personally. It alleges that in or about April 2004 – following the Bayou defendants' liquidation of the Bayou Hedge Funds[1] – Israel and Marino instructed Citibank to transfer $150 million from Bayou's Bronxville Citibank accounts to a "trading account" (in whose name is not pleaded) at Barclay's Bank in London – and then to transfer the money back again. Following these transfers, Citibank allegedly permitted defendant Israel to withdraw millions of dollars from the accounts, transferring them to bank accounts individually owned by and under the sole control of Israel. Israel allegedly "emptied five Bayou accounts held by Citibank over the course of six days, withdrawing some $161 million." Four of those accounts were "explicitly and directly in the name of" four specific Bayou Hedge Funds. The fifth account held money in the name of Bayou Management. (Am Cplt. ¶¶ 77-78). The dates of these transfers is not pleaded. However, the complaint specifically pleads that, on July 8, 2004 (more than a year before the Funds closed down), Citibank wired $120 million from Bayou's Citibank accounts to Deutsche Postbank in Hamburg, Germany, into accounts in Israel's name.

Plaintiffs allege, again in conclusory fashion, that Citibank "knew or disregarded" that the money in these accounts were "Bayou class member investor funds" (Am Cplt. ¶79), and that Citibank was "holding the Bayou fund proceeds for the benefit of the Bayou Class member investors." (Am. Cplt. ¶ 80). The alleged basis for this knowledge is that "many Class members originally invested in the Bayou Hedge Funds by making wire transfers and other deposits directly to Citibank," in accordance with Wire Transfer Instructions – supplied by Citibank – which indicated that the funds were to be "held and maintained in the names of the Bayou Hedge funds." (Id.). For example, the Broad-Bussel funds discussed above were wired to an account denominated "Bayou Management LLC Special Account as agent for Bayou Superfund LLC." (Id.)

Plaintiffs specifically (albeit conclusorily) allege that the funds that Israel and Marino withdrew from Citibank were "funds held by Citibank as a fiduciary for the benefits of Plaintiffs and the members of the Class who invested in the Bayou Hedge Funds." (Am. Cplt. ¶ 81). However, Plaintiffs do not allege that the accounts were denominated fiduciary accounts or that there was anything about those accounts that differentiated them from the thousands of corporate accounts, maintained at Citibank and every other bank, into which customers routinely wire funds as part of routine business transactions. So as insurance, plaintiffs fall back on what they refer to as their "very minimum" allegation: that Citibank negligently permitted Israel to withdraw proceeds that the bank either knew or disregarded were "beneficially owned" by Class member investors – funds it had received earmarked for investment in the Bayou Hedge Funds.

Citibank moves to dismiss the causes of action asserted against it.

---

[1] Since the funds were not liquidated until July 2005, this allegation makes no sense. However, I assume it to be true and view it as favorably toward plaintiffs as I can.

*The Second Circuit's Opinion in <u>Lerner II</u>*

After this motion was fully briefed, the United States Court of Appeals for the Second Circuit handed down its opinion in <u>Lerner II</u>. The factual allegations in <u>Lerner II</u>, while not identical to those in this case, are sufficiently similar to make the decision important to the determination of this motion – indeed, the claims asserted against two commercial banks are virtually identical to those asserted against Citibank in this lawsuit.

The plaintiffs in <u>Lerner II</u>, like the plaintiffs here, are investors who were defrauded by an attorney named David Schick, who was engaged in a multi-million dollar Ponzi scheme. Unable to recover their funds from Schick's estate in bankruptcy, some investors went after various banks, alleging that they had either aided and abetted or failed to detect Schick's fraudulent activities.

Schick convinced investors that he had devised a no-risk scheme for generating a high return on their investments. He would bid on distressed mortgage pools at auctions conducted by the Resolution Trust Company (RTC), the Federal Deposit Insurance Company (FDIC) and other banking institutions. If he won the bid, he would immediately try to re-sell the pool to another buyer, making a quick profit. The acceptance of his winning bid was subject to a 90 day due diligence period, so Schick assured his investors that if he was unable to find a buyer within that period he would be able to rescind this original purchase without incurring any penalty.

However, in order to win bids in the first place, Schick had to prove to the FDIC that he had the financial wherewithal to complete the purchase. He did this by obtaining money from his investors up front, which he deposited in banks as evidence of his good faith. To convince investors to part with their funds well before the purchase they were funding was about to close, Schick agreed to deposit the funds in escrow accounts that were covered by restrictive provisions. He signed escrow agreements with his investors, which expressly stated that the funds were being held in escrow, that Schick agreed to act a fiduciary for those funds, and that "the only person who shall be entitled to, or have any right or interest in the Escrow Deposit shall be the Depositor." With these written guarantees, provided by an attorney in good standing with the New York bar, investors turned their money over to Schick for deposit into various banks.

Schick never entered into escrow agreements with the banks into which he deposited investor funds, so the banks did not segregate the investor assets from their other assets. Instead, he deposited the money into the attorney trust accounts that he maintained with the banks. Funds in his attorney trust accounts were part of the bank's general deposits, which meant that Schick (contrary to his representations to his investors) could access the funds at any time without his investors' knowledge or consent. Schick managed to steal $82 million of these deposits before his fraud was discovered.

However, each of the defendant banks had entered into a written agreement with the Lawyer's Fund for Client Protection of the State of New York, as required by New York's

Attorney Disciplinary Code. The Code requires lawyers who are in possession of funds belonging to another person (incident to his practice of law) to maintain those funds in a New York banking institution that will agree to report any dishonored checks, and the defendant banks in Lerner II had agreed to comply with that provision. The Lawyers' Fund relies on these reports to institute disciplinary proceedings against lawyers who mishandle client funds.

According to the amended complaint in Lerner II, one Leonard Patnoi, an officer of Fleet Bank, agreed to permit Schick to write overdraft checks on his attorney fiduciary accounts, which Fleet would honor by extending automatic loans to cover the overdrafts. When other bank officers threatened to put a stop to this practice, Patnoi agreed not to report overdrafts to the Lawyers' Fund and to lie about the balances in the accounts if inquiry was made – a blatant violation of the bank's agreement with the Lawyers' Fund. When Schick later opened an account at Republic Bank, Republic also allegedly returned a series of checks for insufficient funds but failed to report the transactions to the Lawyers' Fund.

Apparently some of the checks that were bouncing were written to investors who were getting their money out of prior investments. Not surprisingly, these investors were asking difficult to answer questions. So Patnoi (and, allegedly, his superiors) devised a plan to return the check to the payees, not designated as "insufficient funds," but marked "refer to maker." When one investor, Lerner, received such a check and made inquiry at the bank, he was told that there were "back office problems" that had nothing to do with Schick.

There was no allegation in the complaint that either Fleet or Republic was aware that Schick was converting money from the client accounts to his own use.

The plaintiffs alleged four state law claims against Fleet and Republic: fraud and aiding and abetting fraud; breach of fiduciary duty and aiding and abetting breach of fiduciary duty; negligence and commercial bad faith. The district court dismissed all these claims; the Second Circuit affirmed the dismissal of the fraud and aiding and abetting fraud claim and the commercial bad faith claim, on the ground that both such causes of action required that the bank have actual knowledge of Schick's underlying fraud, which had not been alleged with the requisite particularity.

The Court of Appeals did, however, reverse the district court's dismissal of the claims for negligence (at least as to those investors whose funds were on deposit at the defendant banks) and for aiding and abetting a breach of fiduciary duty.

The Circuit began by acknowledging that "Banks do not owe non-customers a duty to protect them from the intentional torts of [the banks'] customers," In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 830 (S.D.N.Y. 2005); Century Bus. Credit Corp. v. North Fork Bank, 246 A.D. 2d 395, 396 (1st Dept. 1998), and that "A depository bank has no duty to monitor fiduciary accounts maintained at its branches in order to safeguard funds in those account from fiduciary misappropriation," Grace ex rel. Fox v. Corn Exch. Bank Trust Co., 287

5

N.Y. 94, 102 (1941). However, the Court of Appeals concluded, on the facts alleged (and assuming them to be true), that the plaintiffs whose funds had been deposited in the defendant banks had stated a claim for negligence – because those facts, if proved, would give rise to the duty of care necessary to sustain a negligence cause of action.

The Circuit began by noting a third rule of settled New York law: "A bank may be liable for participation in [a fiduciary] diversion, either by itself acquiring a benefit, or by notice or knowledge that a diversion is intended or being executed." In re Know, 64 N.Y.2d 434, 438 (1985). The facts pleaded in Lerner II – especially a "chronic insufficiency of funds," such as occurred in Schick's IOLA accounts – were deemed "sufficient to cause a reasonably prudent person to suspect that trust funds are being misappropriated," thus triggering "a duty of inquiry on the part of a depositary bank." Norwest Mortgage, Inc. v. Dime Sav. Bank of New York, 280 A.D. 2d 653, 654 (2d Dept. 2001).

The Second Circuit also concluded that the complaint stated a claim for aiding and abetting breach of fiduciary duty. Taken together, the allegations that Schick was routinely overdrawing his fiduciary accounts; that numerous checks written on those accounts were dishonored for insufficient funds; and that Schick on "numerous occasions" transferred funds from the Schick Attorney Fiduciary Accounts to his personal account(s), were deemed sufficient to state a claim for aiding and abetting a breach of fiduciary duty, because "Schick's commingling of funds was not only an indication of a breach of fiduciary duty – it was, in and of itself, a breach." The banks in Lerner II were alleged to have given substantial assistance to this breach of fiduciary duty by failing to comply with their contractual duty to report the dishonored checks and the diversion of funds to the Lawyers' Fund. As a result, they failed to discharge their duty to prevent the diversion of funds that the banks well knew were not supposed to be diverted, because they knew of the fiduciary nature of the accounts – attorney IOLA accounts – and because they had actually signed agreements with the Lawyers' Fund requiring them to disclosure apparent improprieties. Additionally (although the Court of Appeals did not rely on this ground in finding sufficient allegations of substantial assistance), at least Fleet Bank was alleged to have given assistance by coming up with creative ways to cover up the overdrafts.

*Claims Against Citibank*

Having explained Lerner II, I turn to the claims asserted in this action.

The aiding and abetting fraud and commercial bad faith claims asserted against Citibank must be dismissed for exactly the same reason that they were dismissed against the banks in Lerner II. The complaint does not contain any particularized allegations from which one could infer that Citibank was aware that Bayou was anything other than a legitimate hedge fund. There are certainly no allegations (particularized or even general) suggesting that Citibank was aware that the fund was a fraudulent enterprise, or that Israel was looting it. This bars any claim for aiding and abetting a fraud or for commercial bad faith. After Lerner II, there is no doubt that these claims cannot survive a motion to dismiss.

6

I decline plaintiffs' suggestion that I grant them leave to amend their complaint yet again so that they can try to replead their claim for aiding and abetting fraud against Citibank. The present motion is directed at an amended complaint. It contains not the slightest hint that any Citibank representative knew that Bayou was anything other than a perfectly ordinary hedge fund, or that Israel and Marino were looting money from their investors. There is no reason to believe that plaintiffs will be able to plead a proper claim on their third try.

I also decline to permit plaintiffs to amend their commercial bad faith claim. I am persuaded that the doctrine of commercial bad faith, which arises under the Uniform Commercial Code, applies only when there is an allegation of fraud in the making and cashing of checks. Peck v. Chase Manhattan Bank, N.A., 190 A.D. 2d 547, 548-49 (1st Dept 1993); see also Lerner II at 38 ("We have considerable doubt whether the doctrine [of commercial bad faith] has any applicability to these plaintiffs' claims, which do not allege fraud in the making and cashing of checks."). That being so, amendment would be futile.

The interesting question presented by this motion is whether plaintiffs have pleaded sufficient facts to permit the sort of inference of negligence or breach of fiduciary duty that the Second Circuit found viably pleaded in Lerner II. The answer, I conclude, is no.

In Lerner II, the Second Circuit was careful to recognize and affirm existing New York law that does not impose a duty on banks to monitor fiduciary accounts on behalf of non-customers in order to uncover defalcations by tortfeasor fiduciaries. It did note that a bank could be held liable to non-customers, either in negligence or for aiding and abetting a breach of fiduciary duty, if the bank received a direct benefit from the wrongdoing or had notice of the underlying wrongful activity. There is no allegation in the instant complaint that Citibank received any of the proceeds of Israel and Marino's criminal activity, so I turn to whether the complaint adequately pleads that the banks had notice of the underlying breach of duty.

Here, none of the facts that gave the Lerner II banks notice of Schick's wrongful activity is present. The complaint does not allege that there were any overdrafts, let alone routine overdrafts, from the Bayou accounts at Citibank. Nor is there any allegation of bounced checks. And there certainly is nothing in the complaint to suggest that Citibank had undertaken to make any outside agency aware of unusual activity in the accounts, or that the accounts had any special status under the law, as attorney IOLA accounts clearly do.

Instead, plaintiffs implicitly argue that the facts and circumstances that could give rise to Lerner II liability are not limited to those cited in Lerner II itself. They allege that Citibank should have been alert to the possibility of fraud, and so was on notice to investigate, from the following facts:

NAME OF ACCOUNT. The account from which Israel stole the money was denominated: "Bayou Management LLC Special Account as agent for Bayou Superfund LLC." There is nothing about that name of the account that suggests that Citibank was under any special

duty to monitor transactions in and out. Indeed, there was nothing about the name of the account to suggest that it was a fiduciary account for any person or entity other than Bayou Superfund LLC. It was a business account for a hedge fund – nothing more. Citibank's acceptance of deposits from hedge fund investors could conceivably give rise to the inference that at least some of the money on deposit was held in a fiduciary capacity, but that would not, in and of itself, be enough to alert Citibank that it needed to pay special attention to transactions. Indeed, New York law is directly to the contrary.

MOVEMENT OF MONEY OUT AND INTO THE ACCOUNT: In 2004, a large sum of money was wired out of the account into a trading account at another bank. Shortly thereafter, the same sum came back into the Citibank account. Plaintiffs refer to this as "money laundering," but they do not explain how this movement of money – which apparently resulted in the loss of not a single penny of investor funds – should have alerted Citibank to nefarious activity on the part of Israel and Marino. Drawing all inferences in plaintiffs' favor, this court sees no red light, either.

MOVEMENT OF MONEY OUT OF ACCOUNT: The complaint alleges that, in July 2004, over $120 million was wired from the Bayou hedge fund accounts to a German bank account in the name of Samuel Israel. Drawing all inferences in favor of plaintiffs, one can infer that Citibank – a sophisticated financial institution – knows what a hedge fund is; that the investors in hedge funds are (generally speaking) limited partners in an investment enterprise run by a general partner; and that the general partner (Bayou) is investing on behalf of those individuals as well as itself. A transfer of money to the account of the general partner, or (as in this case) one of its principals, could and perhaps should raise some sort of red flag.

However, New York's banking law specifically provides that a bank may honor a check made payable by an authorized corporate officer (like Israel) to himself without thereby being put on notice of self-dealing. New York Banking Law § 9. And a long line of New York cases – none of them repudiated by the Second Circuit in Lerner II – holds that a bank has the right to presume that a fiduciary will properly apply funds, even if those funds are deposited into te fiduciary's individual account. In re Knox, 64 N.Y.2d 434, 437-38 (NY 1985); Bischoff v. Yorkville Bank, 218 N.Y. 106 (NY 1916).

In this case, a single instance in which a fiduciary deposits money into his personal account – activity that, as a matter of New York law, is not in and of itself improper – is as far from giving rise to Lerner II negligence liability as to render the holding in that case of no moment here.

Moreover, as the Second Circuit recognized, it is not possible to plead a viable claim in negligence unless the plaintiff alleges the existence of a duty toward the plaintiff on the part of the defendant. The reason that the Court of Appeals concluded that the complaint in Lerner II adequately alleged a claim in negligence is because of the pattern of unusual facts that Lerner II had and this case lacks – the "chronic insufficiency of fund" in a lawyer's IOLA accounts, the "routine overdrafts" and dishonored checks drawn on those accounts, the banks' contractual duty

8

to report dishonored checks to an outside agency (the Lawyers' Fund) and their breach of that contract – were so egregious as to create in the banks a duty, where none would otherwise have existed, to make inquiry into what was Schick was doing. Absent those facts, there would have been no such duty. To hold, as plaintiffs would have me do, that a single instance of activity that is not in and of itself illegal is enough to place a bank on notice of a fiduciary defalcation would cause the exception that would swallow the usual rule, and banks would in fact have a duty to non-customers to police fiduciary – and perhaps even regular business – accounts.

Because I concluded that the facts pleaded in the amended complaint are insufficient to create a Lerner II-type duty to Bayou's customers in Citibank, the claim of negligence and aiding and abetting breach of fiduciary duty alleged against Citibank must be dismissed.

Citibank's motion to dismiss the complaint as against it is granted.

Dated: September 6, 2006

_____
U.S.D.J.

9