# EXHIBIT  N

THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL FROM, BUT HAS NOT BEEN APPROVED BY, THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
                                                              :
In re:                                                        :    Chapter 11
                                                              :
BAYOU GROUP, LLC, et al.,                                     :    Case No.: 06-22306 (ASH)
                                                              :
                              Debtors.                        :    Jointly Administered
                                                              :
--------------------------------------------------------------X

## DISCLOSURE STATEMENT WITH RESPECT TO JOINT CHAPTER 11 PLAN OF REORGANIZATION OF BAYOU GROUP, LLC, BAYOU MANAGEMENT, LLC, BAYOU SUPERFUND, LLC, BAYOU NO LEVERAGE FUND, LLC, BAYOU AFFILIATES FUND, LLC, BAYOU ACCREDITED FUND, LLC, BAYOU FUND, LLC, BAYOU ADVISORS, LLC, AND BAYOU EQUITIES, LLC

DECHERT LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 698-3500
H. Jeffrey Schwartz
Gary J. Mennitt
Stephen J. Gordon
Elise Scherr Frejka
Jonathan D. Perry
Attorneys for the Debtors
and Debtors-in-Possession

Dated: June 13, 2007

## DISCLAIMERS

ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL CREDITORS ENTITLED TO VOTE WITH RESPECT TO THE PLAN ARE ADVISED AND ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE SUMMARIES OF THE PLAN AND THE OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE § 1125 AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THOSE CREDITORS WHOSE CLAIMS AGAINST THE DEBTORS ARE IMPAIRED UNDER THE PLAN, TO ENABLE SUCH HOLDERS TO MAKE AN INFORMED DECISION ABOUT THE PLAN.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.  ALTHOUGH THE DEBTORS WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE DEBTORS' CHAPTER 11 CASES, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN SHALL NEITHER CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, OR WAIVER, BUT RATHER A STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

# TABLE OF CONTENTS

Page

I.  EXECUTIVE SUMMARY .................................................................................. 1
    A.  Summary of the Plan.............................................................................. 1
    B.  Summary of Classification and Treatment Under the Plan ..................... 5

II. INTRODUCTION ........................................................................................... 14
    A.  Holders of Claims Entitled to Vote........................................................ 15
    B.  Voting Procedures................................................................................. 16

III. THE PRE-PETITION STRUCTURE AND OPERATIONS OF THE DEBTORS ........ 20
    A.  Pre-Petition Corporate Structure of the Debtors................................... 20
    B.  The Debtors' Pre-Petition Fraud .......................................................... 22
    C.  Government Prosecution of the Debtors' Pre-Petition Principals, Related
        Orders of Forfeiture, and Seizure of the More than $100 million from
        Wachovia Bank Accounts...................................................................... 23
    D.  Distributions of the Government Funds to Defrauded Investors ........... 25
    E.  Formation of the Unofficial Creditors Committee................................. 26
    F.  Appointment of Sole Managing Member of the Debtors ....................... 26

IV. THE DEBTORS' CHAPTER 11 CASES............................................................. 27
    A.  Commencement of the Chapter 11 Cases ............................................. 27
    B.  Appointment of the Creditors Committee............................................. 28
    C.  Significant Events During these Cases ................................................. 29
    D.  Adversary Proceedings Against Redeeming Investors .......................... 32
    E.  Discovery Pursuant to Federal Rule of Bankruptcy Procedure 2004 .... 36
    F.  Proceedings Involving the Off-Shore Funds and Settlement of the Off-
        Shore Claims........................................................................................ 37

V.  OVERVIEW OF THE PLAN ............................................................................ 41
    A.  General................................................................................................ 41
    B.  Assets for Distribution Under the Plan ................................................ 43
    C.  Description of Classification and Treatment of Claims and Equity Interests
        Under the Plan Against the Bayou Hedge Funds................................... 43
    D.  Description of Classification and Treatment of Claims and Equity
        Interests Under the Plan Against Bayou Management ........................... 50
    E.  Reservation of "Cram Down" Rights ................................................... 55
    F.  Provisions Governing Distributions Under the Plan............................. 55
    G.  Means for Implementation and Execution of the Plan.......................... 58
    H.  Procedures for Resolving and Treating Disputed Claims...................... 70

|     | I.   | Treatment of Executory Contracts and Unexpired Leases | 73 |
| VI. |      | EFFECTS OF CONFIRMATION OF PLAN | 74 |
|     | A.   | Vesting of Assets in Litigation Trust | 74 |
|     | B.   | Release of Assets from Bankruptcy Court Jurisdiction | 74 |
|     | C.   | Binding Effect | 74 |
|     | D.   | Term of Injunctions or Stays | 75 |
|     | E.   | Causes of Action | 75 |
|     | F.   | Retention of Jurisdiction by Bankruptcy Court | 75 |
|     | G.   | Dissolution of the Creditors Committee | 77 |
|     | H.   | Exemption from Transfer Taxes | 77 |
| VII. |     | ALTERNATIVES TO THE PLAN | 77 |
|     | A.   | Liquidation Under Chapter 7 of the Bankruptcy Code | 78 |
|     | B.   | Alternative Chapter 11 Plan | 80 |
|     | C.   | Certain Risk Factors | 80 |
| VIII. |    | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 82 |
|     | A.   | Consequences to the Debtors. | 83 |
|     | B.   | Consequences to Holders of Allowed General Unsecured Claims | 84 |
| IX. |      | VOTING PROCEDURES AND REQUIREMENTS | 89 |
|     | A.   | Ballots and Voting Deadline | 89 |
|     | B.   | Holders of Claims Entitled to Vote | 90 |
|     | C.   | Vote Required for Acceptance by a Class | 90 |
|     | D.   | Voting Procedures | 90 |
| X.  |      | CONFIRMATION AND CONSUMMATION PROCEDURES | 91 |
|     | A.   | Conditions Precedent to Effectiveness of Plan | 91 |
|     | B.   | Conditions Precedent to Effective Date | 91 |
|     | C.   | Requirements of Bankruptcy Code § 1129(a) | 92 |
|     | D.   | Best Interests Test | 93 |
|     | E.   | Feasibility | 95 |
|     | F.   | Requirements of Bankruptcy Code § 1129(b) | 95 |
|     | G.   | Classification of Claims and Equity Interests Under the Plan | 97 |
|     | H.   | Confirmation of the Plan If a Class Does Not Accept the Plan | 97 |
|     | I.   | Confirmation Hearing | 98 |
| XI. |      | RECOMMENDATION AND CONCLUSION | 99 |

## I.    EXECUTIVE SUMMARY

On May 30, 2006, each of the debtors in these chapter 11 cases, Bayou Group, LLC ("Bayou Group"), Bayou Management, LLC ("Bayou Management"), Bayou Advisors, LLC ("Bayou Advisors"), Bayou Equities, LLC ("Bayou Equities"), Bayou Fund, LLC ("Bayou Fund"), Bayou Superfund, LLC ("Bayou Superfund"), Bayou No Leverage Fund, LLC ("Bayou No Leverage"), Bayou Affiliates Fund, LLC ("Bayou Affiliates"), and Bayou Accredited Fund, LLC ("Bayou Accredited," and together with Bayou Fund, Bayou Superfund, Bayou No Leverage, and Bayou Affiliates, the "Bayou Hedge Funds") (collectively, the "Debtors"), filed separate voluntary petitions for relief under chapter 11, title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

On June 13, 2007, the Debtors filed their Joint Chapter 11 Plan of Reorganization (the "Plan"), a copy of which is attached hereto as Exhibit A. If confirmed by the Bankruptcy Court, the Plan will govern and control the treatment afforded all Claims against the Debtors. The Plan also provides a mechanism for the resolution of the pending adversary proceedings brought by certain of the Debtors against certain investors in the Bayou Hedge Funds. This disclosure statement, dated June 13, 2007 (the "Disclosure Statement"), describes certain aspects of the Plan, the Debtors' pre-petition structure and fraudulent business operations, significant events occurring in these chapter 11 cases, and related matters.

This executive summary highlights some of the information discussed in greater detail elsewhere in this Disclosure Statement. HOWEVER, THIS SUMMARY MAY NOT CONTAIN ALL OF THE INFORMATION THAT IS IMPORTANT TO YOU. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS THERETO IN THEIR ENTIRETY. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN AND ITS EXHIBITS.

All Exhibits to the Plan will be filed with the Bankruptcy Court and will be available for review, free of charge, on the website of the Debtors (http://www.bayoubankruptcy.com) not later than 10 days before the Voting Deadline. Copies of all Exhibits to the Plan also may be obtained, free of charge, from The Trumbull Group, LLC ("Trumbull" or the "Notice and Balloting Agent") by calling (860) 687-3952.

A.    Summary of the Plan

The primary purpose of the Plan and the Cases is to (i) provide a framework for either the settlement of the Adversary Proceedings or the continuation to conclusion of such litigation, and (ii) distribution of settlement proceeds to creditors. The settlement protocol set forth in Article 1 of the Plan for treatment of the Redeemer Defendants is intended to provide those Redeemer Defendants as well as the Investor Creditors, an opportunity to share, equally, economic loss due to the Ponzi scheme and related fraud perpetrated by the Debtors' principals prior to the Petition Date and the appointment of the Sole Managing Member. The settlement of disputed claims and controversies available to Redeemer Defendants under the Plan is fixed and equally applied and available for acceptance only until the Voting Deadline. The settlement terms are not negotiable,

as it is imperative to the integrity of the settlement protocol, which is intended to provide for an equality of treatment between Redeemer Defendants (who elect to execute the settlement agreement) and Investor Creditors, that all Redeemer Defendants who elect to settle hereunder the claims or controversies pending against them, are settling on the same terms and conditions. Once the Voting Deadline passes, it is the Debtors' intention to proceed with the prosecution of all of the remaining Adversary Proceedings for which no settlement was elected.

Accordingly, if an adverse judgment is rendered against a Redeemer Defendant in its Adversary Proceeding, and such Redeemer Defendant is required to disgorge the entirety of the Redemption Payments received, such Redeemer Defendant's resulting distribution from the Litigation Trusts may not be as much as might be available under the settlement protocol. Alternatively, if a Redeemer Defendant prevails in the Adversary Proceeding as to principal retention, and only the fictitious profits received are returned to the Debtors, the resulting "recovery" in the Cases (by virtue of not having to return any of the Principal portion of the Redemptions) will be greater than the distribution under the claims settlement protocol. Other litigation results are also possible.

The following chart illustrates the foregoing for three different, but common types of Redeemer Defendant:[*]

### Distributions to Redeemer Defendants Making the Settlement Election

| Type | Investment of Principal | Settlement Distribution | (Additional) Estate Distribution | Estimated Further Attorney Fees | Net Distribution - Dollar Amount | Net Distribution - Percentage |
|---|---|---|---|---|---|---|
| Settling Defendant | $1,000,000 | $500,000 | $100,000 | $0 | $600,000 | 60% |
| Settling Defendant | $ 500,000 | $250,000 | $ 50,000 | $0 | $300,000 | 60% |
| Settling Defendant | $ 250,000 | $125,000 | $ 25,000 | $0 | $150,000 | 60% |

### Distributions to Redeemer Defendants If Debtors Win Adversary Proceeding

| Type | Investment of Principal | Settlement Distribution | (Additional) Estate Distribution | Estimated Further Attorney Fees | Net Distribution - Dollar Amount | Net Distribution - Percentage |
|---|---|---|---|---|---|---|
| Non-Settling Defendant | $1,000,000 | $0 | $300,000 | ($100,000) | $200,000 | 20% |
| Non-Settling Defendant | $ 500,000 | $0 | $150,000 | ($50,000) | $100,000 | 20% |
| Non-Settling Defendant | $250,000 | $0 | $ 75,000 | ($25,000) | $ 50,000 | 20% |

### Distributions to Redeemer Defendants if Defendants Win Adversary Proceeding

| Type | Investment of Principal | Settlement Distribution | (Additional) Estate Distribution | Estimated Further Attorney Fees | Net Distribution - Dollar Amount | Net Distribution - Percentage |
|---|---|---|---|---|---|---|
| Non-Settling Defendant | $1,000,000 | $0 | $0 | ($100,000) | $900,000 | 90% |
| Non-Settling Defendant | $ 500,000 | $0 | $0 | ($50,000) | $450,000 | 90% |
| Non-Settling Defendant | $ 250,000 | $0 | $0 | ($25,000) | $225,000 | 90% |

---

[*] Assumptions:

* Government Distribution to Investor Creditors will approximate 30% of Principal Investment.
* The Bayou Hedge Fund's distribution to holders of Allowed Claims in Class 3B will approximate 30% of Principal Investment.
* If Redeemer Defendants lose in the Adversary Proceedings, they each return 100% of the total Redemption Payments to the Debtors' Estates. If the Debtors lose the Adversary Proceedings, the Redeemer Defendants return 100% of Fictitious Profits to the Debtors' Estates.
* Estimated future attorney's fees for Redeemer Defendants that do not enter into the settlement protocol are estimated at 10% of a Redeemer Defendant's Principal Investment (Note: the actual amount of attorneys' fees incurred by individual non-settling Redeemer Defendants to litigate the Adversary Proceedings to judgment will likely far exceed the $25,000 to $100,000 range illustrated above, thereby further diluting the recoveries of the Redeemer Defendants that do not opt to participate in the settlement protocol).
* The Bankruptcy Court enters judgment in the Declaratory Judgment action and holds that there is no credit, holdback, reduction in claim, or other adjustment on account of the Government Funds distribution to Investor Creditors. he determination of the Declaratory Judgment on the application of the collateral source rule will impact creditor recoveries. See Article 5 – "Provisions Governing Distributions—Effect of the Declaratory Judgment Action."

The Debtors believe the settlement protocol represents a fair compromise of the Adversary Proceedings in that (i) it provides a mechanism for Redeemer Defendants and Investor Creditors to, in effect, recover equally on their original principal investments in the Bayou Hedge Funds; (ii) further legal fees and expenses for both the Redeemer Defendants and the Estates can be minimized; and (iii) the risks of litigation, and the resulting economic risks, can be eliminated.

Accordingly, the Plan seeks to reorganize the Debtors and provide fair, equitable, and reasonable treatment to all creditors of and investors in the Bayou Hedge Funds.

The Plan is predicated on the following fundamental principles and assumptions: (1) each of the Debtors were operated fraudulently pre-petition, the Bayou Hedge Funds were operated as a Ponzi scheme, each of the investors who acquired membership interests in the Bayou Hedge Funds was fraudulently induced into doing so and redemption from the Bayou Hedge Funds were knowingly inflated by the Debtors' pre-petition management. Thus, all of the investors in the Bayou Hedge Funds have restitution claims against the Debtors for return of their principal investments; (2) as a result of the Debtors' operation as a fraudulent Ponzi scheme, it will be so costly as to consume the assets of the Bayou Hedge Funds, and perhaps futile to attempt to disentangle the assets and liabilities of each of the Bayou Hedge Funds, and thus it inures to the benefit of all creditors to treat the Bayou Hedge Funds on a consolidated basis and equalize the recoveries of the investor creditors from a common asset pool; and (3) the only available assets of the Debtors are legal claims, including fraudulent transfer claims against redeeming investors and others that received transfers of money or other property from the Debtors, and the proceeds of any such claims.

Taking those circumstances into account, the Plan seeks to achieve equalization among all of the investors in the Bayou Hedge Funds by making pro rata distributions to investor creditors such that each investor will end up retaining approximately the same percentage of their principal investment. Thus, each investor who did not receive any redemption payment from the Bayou Hedge Funds will have an Allowed Claim for the amount of its principal investment of the Bayou Hedge Funds, and will receive a pro rata share of any distributions under the Plan.

The Plan is entirely separate and independent from any distribution that may be made by the United States of America as restitution to victims of the Bayou fraud. In connection with the criminal prosecutions of the Debtors' pre-petition principals, the United States has seized certain assets from the pre-petition principals, including more than $106 million in funds that the Arizona Attorney General initially had seized from several bank accounts relating to the Bayou fraud, as well as certain other private equity investments made with funds belonging to the Bayou Hedge Funds. The Debtors' present understanding is that the United States plans to distribute those forfeited assets on a pro rata basis to the investor creditors in the Bayou Hedge Funds and the Bayou Off-Shore Hedge Funds, but not to any investor who is not a victim with a liquidated, non-contingent claim. Thus, it is the Debtors' present understanding that an investor who had received a redemption payment equal to its entire principal investment will not receive a distribution from the United States of the forfeited assets even if that investor is currently a defendant in an adversary proceeding brought by the Debtors. The Debtors are not responsible for, and have no control over, the forfeited assets held by the United States or the amount, timing, or procedure of distribution of those assets. However, nothing in the Plan will preclude any

creditor from seeking and recovering any distribution of those forfeited assets from the United States.

The Plan also allows each Redeemer Defendant to elect to participate in the Plan by executing a non-negotiable settlement agreement. The objective of the settlement terms proposed by the Debtors is to equalize, on the basis of principal invested, the Redeemer Defendants with the Investor Creditors, taking into consideration both the distribution the investor creditors will receive under the Plan and the distribution the investor creditors would hypothetically receive from the United States if such defendant returned the fraudulent transfer and filed a restitution claim for the amount of such defendant's principal investment.

B.    Summary of Classification and Treatment Under the Plan

The Plan classifies Claims against and Equity Interest in the Debtors for all purposes, including voting, confirmation, and distribution as set forth below. The table is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. Reference should be made to the Entire Disclosure Statement, the Plan, and the Exhibits thereto in their entirety for a complete description of each classification and treatment.

For certain classes of Claims estimated percentage recoveries are set forth below. For certain classes of Claims, the actual amounts of Allowed Claims could materially exceed or could be materially less than the estimated amounts shown.

### BAYOU HEDGE FUNDS

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| N/A | Administrative Expense Claims | $[_____] | Estimated Recovery: 100% |
| | | | Each holder of an Allowed Administrative Expense Claim will receive Cash equal to the Allowed amount of such Administrative Claim either (a) on the Effective Date or (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a stipulation of amount and nature of such Administrative Claim is executed by the Bayou Hedge Funds Litigation Trust and the holder of the Administrative Claim. |
| N/A | Allowed DIP Facility Claims and any other Outstanding Secured Claims | $[_____] | Estimated Recovery: 100% |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| | | | At its election and in consultation with the Creditors Committee, the Bayou Hedge Funds will either: (a) pay the amount of the Allowed DIP Facility Claim or any other Allowed Outstanding Secured Claim (if any) against it in full, in Cash, on the later of the Initial Distribution Date or the Allowance Date of such Claim; (b) pay the Allowed DIP Facility Claim or any other Allowed Outstanding Secured Claim (if any) in full in the ordinary course in accordance with the terms and conditions of the underlying documents giving rise to such Claim; or (c) treat the Allowed DIP Facility Claim or any other Allowed Outstanding Secured Claim (if any) in a manner otherwise agreed to by the holder thereof. |
| N/A | Priority Tax Claims | $[_____] | Estimated Recovery: 100% Each holder of an Allowed Priority Tax Claim, if any, will receive, at the election of the Bayou Hedge Funds either (i) Cash equal to the amount of such Allowed Claim on the later of (a) the Initial Distribution Date and (b) the date that is 10 days after the Allowance Date, or (ii) deferred Cash payments (a) of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim, (b) over a period not exceeding five years after the Petition Date, and (c) in a manner not less favorable than the treatment of Allowed Class 2 Claims under the Plan, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim. |
| Class 1 | Priority Non-Tax Claims | $[0.00] | Estimated Recovery: 100% **Unimpaired and not Entitled to Vote** Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Priority Non-Tax Claim, if any, will receive Cash equal to the amount of such Allowed Claim on the later of (a) the Initial Distribution Date and (b) the date that is 10 days after the Allowance Date. |
| Class 2 | Off-Shore Claims | $37,400,000 | Estimated Recovery: ___% |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| | | | **Impaired and Entitled to Vote** |
| | | | On the Effective Date or as soon thereafter as is practicable, the Bayou Hedge Funds Litigation Trust shall consummate the Off-Shore Settlement Agreement. |
| Class 3A | Senior General Unsecured Claims | It is estimated that the aggregate Allowed Claims in Class 3A will be approximately $[___] million | Estimated Recovery: approximately __% |
| | | | **Impaired and Entitled to Vote:** |
| | | | Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Class 3A Claim will receive distributions from the Bayou Hedge Funds Litigation Trust in an amount equal to such holder's Pro Rata Share of the Bayou Hedge Funds Litigation Trust Claims Proceeds. |
| Class 3B | General Unsecured Claims | It is estimated that the aggregate Allowed Claims in Class 3B will be approximately $[___] million | Estimated Recovery: approximately __% |
| | | | **Impaired and Entitled to Vote:** |
| | | | Subject to (a) the payment in full or reserve of all Allowed Senior General Unsecured Claims and (b) the deemed partial disallowance of certain Class 3A Claims in the amount and manner set forth in Plan Section ____, each holder of a Class 3B Claim (including all Converted Class 4 Claims, if any) will receive distributions from the Bayou Hedge Funds Litigation Trust in an amount equal to such holder's Pro Rata Share of the Bayou Hedge Funds Litigation Trust Claims Proceeds. |
| Class 4 | Redeemer Defendant Claims | N/A | **Impaired and Entitled to Vote** |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| | | | Each holder of a Class 4 Claim who does not elect to enter into a Settlement Agreement will retain all of its claims, rights, remedies, causes of action, and defenses still then available to such party as a matter of law against or pertaining to the Debtors, and will be entitled to assert or pursue such Defendant Claims against the Bayou Hedge Funds and/or the Bayou Hedge Funds Litigation Trust (as applicable) in any manner as may then still be legally permissible. Any holder of a Class 4 Claim who does not elect to enter into a Settlement Agreement will not receive any Cash or other consideration or distribution from the Bayou Hedge Funds, the Estates, the Assets, or the Litigation Trust beyond any portion of the Redemption Payment that such party previously received and may legally be permitted to retain, if any, upon the resolution of the applicable Adversary Proceeding that has been commenced against such party. |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| | | | Alternatively, each holder of a Class 4 Claim may elect to enter into a Settlement Agreement with the Bayou Hedge Funds Litigation Trust settling and resolving the Adversary Proceeding against such holder as follows. |
| | | | Each Complete Redeemer Defendant making the Settlement Election will, under the applicable Complete Redeemer Settlement Agreement, pay to the Bayou Hedge Funds Litigation Trust an amount equal to the sum of (A) 50% of the Redemption Payment(s) of Principal such Settling Complete Redeemer Defendant received plus (B) 100% of the Redemption Payment of Purported Profit such Settling Complete Redeemer Defendant received; (2)(A) waive any and all claims, causes of action, or other right to payment such Settling Complete Redeemer Defendant has, may have, or may assert against any of the Government Funds or any of the proceeds thereof, and (B) assign to the Bayou Hedge Funds Litigation Trust any distribution such Settling Complete Redeemer may, nonetheless, receive from the Government Funds, and (3) at such time as all of the Investor Creditors shall have received an aggregate distribution from or on account of the Government Funds and the Bayou Hedge Funds Litigation Trust of an aggregate amount equal to 50% of their Allowed Claims, be entitled to receive distributions from the Bayou Hedge Funds Litigation Trust equal to such Settling Complete Redeemer Defendant's Pro Rata Share of the Bayou Hedge Funds Litigation Trust Claims Proceeds thereafter distributed by the Bayou Hedge Funds Litigation Trust. |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
|  |  |  | Each Partial Redeemer Defendant making the Settlement Election will, under the applicable Partial Redeemer Settlement Agreement, pay to the Bayou Hedge Funds Litigation Trust an amount equal to the amount of the Redemption Payment of Principal that exceeds 50% of the Redemption Payment received by such Partial Redeemer Defendant from the Bayou Hedge Funds; (2)(A) waive any and all claims, causes of action, or other right to payment such Settling Partial Redeemer Defendant has, may have, or may assert against any of the Government Funds or any of the proceeds thereof, and (B) assign to the Bayou Hedge Funds Litigation Trust any distribution such Settling Partial Redeemer may, nonetheless, receive from the Government Funds, and (3) at such time as all of the Investor Creditors shall have received an aggregate distribution from or on account of the Government Funds and the Bayou Hedge Funds Litigation Trust of an aggregate amount equal to 50% of their Allowed Claims, taking into account the amount of any Redemption Payment such parties received, be entitled to receive payments from the Bayou Hedge Funds Litigation Trust equal to such Settling Partial Redeemer Defendant's Pro Rata Share of the Bayou Hedge Funds Litigation Trust Claims Proceeds thereafter distributed by the Bayou Hedge Funds Litigation Trust. |
| Class 5 | Equity Interests | N/A | Recovery: 0% <br><br>**Impaired and Not Entitled to Vote** <br><br>Each holder of an Equity Interest in any of the Debtors shall neither receive nor retain any property or interest in property on account of such Equity Interest. |

## BAYOU MANAGEMENT

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| N/A | Administrative Expense Claims | $[_____] | Estimated Recovery: 100% |
| | | | Each holder of an Allowed Administrative Expense Claim will receive Cash equal to the Allowed amount of such Administrative Claim either (a) on the Effective Date or (b) if the Administrative Claim is not Allowed as of the Effective Date, 30 days after the date on which an order allowing such Administrative Claim becomes a Final Order or a stipulation of amount and nature of such Administrative Claim is executed by the Bayou Management Litigation Trust and the holder of the Administrative Claim. |
| N/A | Allowed DIP Facility Claims and any other Outstanding Secured Claims | $[_____] | Estimated Recovery: 100% |
| | | | At its election, Bayou Management, in consultation with the Creditors Committee, will either: (a) pay the amount of the Allowed DIP Facility Claim or any other Allowed Outstanding Secured Claim (if any) against it in full, in Cash, on the later of the Initial Distribution Date or the Allowance Date of such Claim; (b) pay the Allowed DIP Facility Claim or any other Allowed Outstanding Secured Claim (if any) in full in the ordinary course in accordance with the terms and conditions of the underlying documents giving rise to such Claim; or (c) treat the Allowed DIP Facility Claim or any other Allowed Outstanding Secured Claim (if any) in a manner otherwise agreed to by the holder thereof. |
| N/A | Priority Tax Claims | $[_____] | Estimated Recovery: 100% |

11

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| | | | Each holder of an Allowed Priority Tax Claim, if any, will receive, at the election of Bayou Management either (i) Cash equal to the amount of such Allowed Claim on the later of (a) the Initial Distribution Date and (b) the date that is 10 days after the Allowance Date, or (ii) deferred Cash payments (a) of a total value, as of the Effective Date, equal to the Allowed amount of such Priority Tax Claim, (b) over a period not exceeding five years after the Petition Date, and (c) in a manner not less favorable than the treatment of Allowed Class 2 Claims under the Plan, except to the extent such holder has agreed to a less favorable treatment of such Allowed Claim. |
| Class 1 | Priority Non-Tax Claims | $[0.00] | Estimated Recovery: 100% <br><br>**Unimpaired and not Entitled to Vote**<br><br>Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Priority Non-Tax Claim, if any, will receive Cash equal to the amount of such Allowed Claim on the later of (a) the Initial Distribution Date and (b) the date that is 10 days after the Allowance Date. |
| Class 2 | Off-Shore Claims | $37,400,000 | Estimated Recovery: ___% <br><br>**Impaired and Entitled to Vote**<br><br>On the Effective Date or as soon thereafter as is practicable, the Bayou Management Litigation Trust shall consummate the Off-Shore Settlement Agreement. |
| Class 3A | Senior General Unsecured Claims | It is estimated that the aggregate Allowed Claims in Class 3A will be approximately $[___] million | Estimated Recovery: approximately ___% <br><br>**Impaired and Entitled to Vote:** |

| Class Number | Description of Class | Estimated Amount of Allowed Claims in Class | Treatment Under the Plan/ Estimated % Recovery Under the Plan |
|---|---|---|---|
| | | | Except to the extent such holder has agreed to a less favorable treatment of its Allowed Claim, each holder of an Allowed Class 3A Claim will receive distributions from the Bayou Management Litigation Trust in an amount equal to such holder's Pro Rata Share of the Bayou Management Litigation Trust Claims Proceeds. |
| Class 3B | General Unsecured Claims | It is estimated that the aggregate Allowed Claims in Class 3B will be approximately $[___] million | Estimated Recovery ___% |
| | | | **Impaired and Entitled to Vote:** |
| | | | Subject to (a) the payment in full or reserve of all Allowed Senior General Unsecured Claims and (b) the deemed partial disallowance of certain Class 3B Claims in the amount and manner set forth in Plan Section ____, each holder of a Class 3B Claim (including all Converted Class 4 Claims, if any) will receive distributions from the Bayou Management Litigation Trust in an amount equal to such holder's Pro Rata Share of the Bayou Management Litigation Trust Claims Proceeds.. |
| Class 4 | Redeemer Defendant Claims | N/A | Estimated Recovery: approximately 0% |
| | | | **N/A** |
| | | | Each Redeemer Defendant will continue to defend the Adversary Proceeding and each Redeemer Defendant retains any and all of its Defendant Claims, and shall be entitled to assert or pursue such Defendant Claims against the Bayou Management Litigation Trust in any manner as may then still be legally permissible at the applicable time |
| Class 5 | Equity Interests | N/A | Recovery: 0% |
| | | | **Impaired and Not Entitled to Vote** |
| | | | Each holder of an Equity Interest in any of the Debtors shall neither receive nor retain any property or interest in property on account of such Equity Interest. |

**ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES SET FORTH ABOVE FOR CLASSES 2, 3, and 4 (WITH RESPECT TO THOSE HOLDERS OF CLASS 4 CLAIMS MAKING THE SETTLEMENT ELECTION) ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERY, THERE IS NO ASSURANCE THAT THE ACTUAL PERCENTAGE RECOVERIES WILL NOT OTHERWISE BE SIGNIFICANTLY LESS THAN THE ESTIMATED PERCENTAGE RECOVERIES SET FORTH ABOVE.** The actual recoveries under the Plan by the Debtors' Creditors in Class 2, 3, and 4 will depend upon a variety of factors including, but not limited to, the actual value of the Litigation Trust Assets. Accordingly, no representation can be or is being made with respect to whether each of the estimated percentage recoveries with respect to Classes 2, 3, and 4 will actually be realized by the Holder of an Allowed Claim in such Classes.

The Debtors believe this Plan provides the best opportunity for all creditors to maximize their recoveries in these Cases, and accordingly, the Debtors urge all creditors to analyze the Plan, the settlement protocol, as applicable, and vote to accept the Plan.

## II.     INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of acceptances of their joint Plan. The Debtors are seeking approval of the Plan. Unless otherwise defined herein, all capitalized terms used in this Disclosure Statement have the meaning ascribed to them in the Plan.

A BALLOT IS ENCLOSED WITH THIS DISCLOSURE STATEMENT IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, WHICH ARE CLASS 2 (OFF-SHORE CLAIMS), CLASS 3A (SENIOR GENERAL UNSECURED CLAIMS), CLASS 3B (GENERAL UNSECURED CLAIMS), AND CLASS 4 (REDEEMER DEFENDANT CLAIMS).

THE RESPECTIVE APPLICABLE BALLOTS CONTAIN PROVISIONS:

(1)     ENABLING EACH HOLDER OF AN ALLOWED CLAIM IN CLASS 2 (OFF-SHORE CLAIMS), CLASS 3A (SENIOR GENERAL UNSECURED CLAIMS), AND 3B (GENERAL UNSECURED CLAIMS) TO VOTE ON ACCEPTANCE OR REJECTION OF THE PLAN; AND

(2)     ENABLING EACH HOLDER OF AN ALLOWED CLAIM IN CLASS 4 (REDEEMER DEFENDANTS) TO VOTE ON ACCEPTANCE OR REJECTION OF THE PLAN BY OPTING FOR OR AGAINST THE SETTLEMENT ELECTION.

HOLDERS OF PRIORITY NON-TAX CLAIMS ARE UNIMPAIRED BY THE PLAN, ARE CONCLUSIVELY PRESUMED TO HAVE ACCEPTED THE PLAN, ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, AND ARE THUS NOT RECEIVING BALLOTS. IN ADDITION, HOLDERS OF (A) ADMINISTRATIVE CLAIMS AND (B) ALLOWED DIP FACILITY CLAIMS AND ANY OTHER SECURED CLAIMS (IF

ANY) ARE NOT CLASSIFIED UNDER THE PLAN, ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, AND ARE THUS NOT RECEIVING BALLOTS; THE DEBTORS ESTIMATE THAT HOLDERS OF ALL SUCH CLAIMS WILL RECEIVE A 100% RECOVERY UNDER THE PLAN.

HOLDERS OF EQUITY INTERESTS IN THE DEBTORS ARE RECEIVING NO DISTRIBUTIONS UNDER THE PLAN, ARE DEEMED TO HAVE REJECTED THE PLAN, AND ARE THEREFORE NOT RECEIVING BALLOTS AS HOLDERS OF EQUITY INTERESTS.

On July __, 2007, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The order approving the Disclosure Statement (the "Approval and Procedures Order"), sets forth in detail the deadlines, procedures, and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Approval and Procedures Order, and the instructions accompanying the ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes or otherwise and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to Bankruptcy Code § 1125.

A.    Holders of Claims Entitled to Vote

With respect to the Debtors' Plan, Class 1 (Priority Non-Tax Claims) is unimpaired by the Plan and the holders of Claims in such Class are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Holders of Claims in Class 2 (Off-Shore Claims), Class 3A (Senior General Unsecured Claims), and Class 3B (General Unsecured Claims) are impaired by the Plan and the holders of Claims in such Classes are entitled to vote to accept or reject the Plan. Holders of Claims in Class 4 (Redeemer Defendants) are entitled to vote to accept or reject the Plan by opting for or against the Settlement Election.

Because holders of Equity Interests in Class 5 are not entitled to receive or retain any property under the Plan, they are presumed to have rejected the Plan, and therefore, are not entitled to vote on the Plan as holders of Equity Interests.

The Bankruptcy Code defines "acceptance" of a plan (i) by a class of Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims that cast ballots for acceptance or rejection of the plan,

and (ii) by a class of Equity Interests as acceptance by holders in that class that hold at least two-thirds in amount of Allowed Equity Interests in such class that cast ballots for acceptance or rejection of the Plan. For a complete description of the requirements for confirmation of the Plan, *See* Article IX, "Confirmation and Consummation Procedures."

UNDER BANKRUPTCY CODE § 1129, A PLAN CAN BE CONFIRMED ONLY IF AT LEAST ONE IMPAIRED CLASS ACCEPTS THE PLAN. THEREFORE, IN ADDITION TO THE OTHER REQUIREMENTS FOR CONFIRMATION DESCRIBED BELOW, THE PLAN CAN BE CONFIRMED ONLY IF IT IS ACCEPTED BY AT LEAST ONE OF THE FOLLOWING CLASSES: CLASS 2 (OFF-SHORE CLAIMS), CLASS 3 (GENERAL UNSECURED CLAIMS), OR CLASS 4 (REDEEMER DEFENDANTS). IF AT LEAST ONE IMPAIRED CLASS ACCEPTS THE PLAN, BUT ONE OR MORE OTHER CLASSES REJECTS THE PLAN, THE DEBTORS HAVE THE RIGHT TO REQUEST CONFIRMATION OF THE PLAN PURSUANT TO BANKRUPTCY CODE § 1129(b). BANKRUPTCY CODE § 1129(b) PERMITS THE CONFIRMATION OF A PLAN NOTWITHSTANDING THE NON-ACCEPTANCE OF ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR EQUITY INTERESTS. UNDER THAT SECTION, A PLAN MAY BE CONFIRMED BY A BANKRUPTCY COURT IF IT DOES NOT "DISCRIMINATE UNFAIRLY" AND IS "FAIR AND EQUITABLE" WITH RESPECT TO EACH NON-ACCEPTING CLASS. FOR A MORE DETAILED DESCRIPTION OF THE REQUIREMENTS FOR CONFIRMATION OF A NONCONSENSUAL PLAN, SEE ARTICLE IX, SECTION F, "CONFIRMATION AND CONSUMMATION PROCEDURES – REQUIREMENTS OF BANKRUPTCY CODE § 1129(b)."

The Debtors will request confirmation of the Plan over the deemed rejection of the Plan by Class 5 (Equity Interests) if the Plan is accepted by any of Class 2 (Off-Shore Claim), Class 3 (General Unsecured Creditors), or Class 4 (Redeemer Defendants), the other Classes entitled to vote on the Plan. If each of Class 2, Class 3, and Class 4 vote to reject the Plan, the Debtors will announce at or before the Confirmation Hearing whether the Debtors will still seek confirmation of the Plan pursuant to Bankruptcy Code § 1129(b).

B.    Voting Procedures

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Equity Interests in classes of Claims or Equity Interests that are impaired under the terms and provisions of a Chapter 11 plan and that will receive distributions under the Chapter 11 plan are entitled to vote to accept or reject the plan. Classes of Claims or Equity Interests in which the holders will not receive or retain any property under a Chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. Classes of Claims or Equity Interests in which the holders are unimpaired under a Chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Holders of impaired Claims voting on the Plan should complete and sign the ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan." In order for your vote to be counted, you must

complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided. Holders of impaired Claims in Class 4 (Redeemer Defendants) voting to "Accept the Plan" by opting in favor of the Settlement Election must also return a signed Settlement Agreement.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Notice and Balloting Agent:

<u>if by mail</u>:

The Trumbull Group, LLC
Re: Bayou Group, LLC
P.O. Box 721
Windsor, CT 06095

<u>if by mail, hand delivery, or overnight courier</u>:

The Trumbull Group, LLC
Re: Bayou Group, LLC
4 Griffin Road North
Windsor, CT 06095

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN __:00 _.M., PREVAILING EASTERN TIME, ON _____, 2007 (THE "VOTING DEADLINE").

EXCEPT AS OTHERWISE SET FORTH HEREIN OR IN THE PLAN, ANY CLAIM IN AN IMPAIRED CLASS AS TO WHICH AN OBJECTION OR REQUEST FOR ESTIMATION IS PENDING OR WHICH IS SCHEDULED BY THE DEBTORS AS UNLIQUIDATED, DISPUTED, OR CONTINGENT IS NOT ENTITLED TO VOTE UNLESS THE HOLDER OF SUCH CLAIM HAS OBTAINED AN ORDER OF THE BANKRUPTCY COURT TEMPORARILY ALLOWING SUCH CLAIM FOR THE PURPOSE OF VOTING ON THE PLAN.

PURSUANT TO THE ORDER APPROVING THE DISCLOSURE STATEMENT, THE BANKRUPTCY COURT HAS SET _____, 2007 AS THE RECORD DATE FOR VOTING ON THE PLAN. ACCORDINGLY, ONLY HOLDERS OF RECORD AS OF _____, 2007 THAT ARE OTHERWISE ENTITLED TO VOTE UNDER THE PLAN WILL RECEIVE A BALLOT AND MAY VOTE ON THE PLAN.

1.    <u>Ballots</u>

All votes to accept or reject the Plan with respect to any Class of Claims must be cast by properly submitting the duly completed and executed form of ballot designated for such Class.

In accordance with Bankruptcy Rule 3018(c), the ballots are based on Official Form No. 14, but have been modified to meet the particular needs of these cases. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

Each ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim for voting purposes (if the Claim is a Contested Claim, this amount may not be the amount ultimately allowed for purposes of distribution) and the Class into which the Claim or has been placed under the Plan. In voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

2.    Voting Multiple Claims

Separate forms of ballots are provided for voting the various Claims and Classes of Claims. A SEPARATE ballot must be used for each Claim. Any Person who holds Claims in more than one Class that is entitled to vote or multiple Claims within a Class entitled to vote is required to vote separately with respect to each such Claim. Please sign, and return in accordance with the instructions in this section, a separate ballot with respect to each such Claim. Only ballots with original signatures will be accepted. Ballots with copied signatures will NOT be accepted.

3.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a Confirmation Hearing at which it will hear objections (if any) and consider evidence with respect to whether the Plan should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Bankruptcy Code § 1129 are met.

The Confirmation Hearing has been scheduled to begin on _____, 2007, at ___:___ __.m. (Prevailing Eastern Time) before the Honorable Adlai S. Hardin, Jr., United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, White Plains Division, 300 Quarropas Street, White Plains, New York 10601. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to the confirmation of the Plan must be made in writing and detail (a) the name and address of the objector, (b) the amount and nature of the Claim or Equity Interest held by the objector; and (c) all grounds for the objection. Any such objection must be filed with the Bankruptcy Court, with a copy to Judge Hardin's Chambers, and served so that it is received by the Bankruptcy Court, Judge Hardin's Chambers, and the following parties on or before _____, 2007 at ___:___ __.m. (Prevailing Eastern Time): (a) the Debtors, c/o Winston & Strawn, LLP, 35 W. Wacker Drive, Chicago, Illinois 60601-9703110 (Attn: Jeff J. Marwil, Esq.); (b) Dechert LLP, Attorneys for the Debtors, 30 Rockefeller Plaza, New York, New York 10012 (Attn: H. Jeffrey Schwartz, Esq. and Elise Scherr Frejka, Esq.); (c) Kasowitz Benson Torres & Friedman, LLP, Bankruptcy Counsel for the Committee, 1633 Broadway, New York, New York 10019 (Attention: Joseph A. Gershman, Esq.) and Kirkpatrick Lockhart Preston Gates Ellis LLP, Litigation Counsel for the Committee, 1735 New York Avenue NW, Suite 500 Washington, DC, 20006-5209 (Attention: Richard A. Kirby, Esq.); and (d) the Office of the

United States Trustee for the Southern District of New York, 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201 (Attn: Lisa L. Lambert, Esq.).

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES THEREOF. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER FULLY THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, ARTICLE VI, SECTION C, "ALTERNATIVES TO THE PLAN – CERTAIN RISK FACTORS," BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

> THE DEBTORS BELIEVE THAT THE PROPOSED PLAN PROVIDES FOR THE BEST POSSIBLE RECOVERIES TO HOLDERS OF OFF-SHORE CLAIMS, GENERAL UNSECURED CREDITORS AND DEFENDANT REDEEMERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF ALL CREDITORS (INCLUDING THE INVESTOR CREDITORS). ACCORDINGLY, THE DEBTORS RECOMMEND THAT THOSE CREDITORS ENTITLED TO VOTE DO VOTE TO ACCEPT THE PLAN.

III.    THE PRE-PETITION STRUCTURE AND OPERATIONS OF THE DEBTORS

A.    Pre-Petition Corporate Structure of the Debtors

The Debtors, including certain off-shore affiliates, are an affiliated group of entities that created, operated, comprised, and controlled private pooled investment funds (commonly known as "hedge funds"). As more particularly described below, prior to the Petition Date, the Debtors operated their hedge funds as a fraudulent Ponzi scheme, and engaged in a series of fraudulent actions and transactions in furtherance of their criminal scheme. The Bayou Hedge Funds were formed for the purpose of obtaining contributions from sophisticated investors and earning profits by following an investment strategy of conducting short-term trading of various securities.

Samuel Israel III ("Israel") and James G. Marquez ("Marquez") formed the Debtors in early 1996 and together with Daniel E. Marino ("Marino") they fraudulently operated the Debtors through the collapse of the Debtors' hedge funds in August 2005 (Marquez withdrew from the Debtors in or about October 10, 2001). The Debtors were headquartered in Stamford, Connecticut until August 2005 when all business operations ceased and the United States Attorney for the Southern District of New York seized all property of the Debtors as discussed in further detail in Article III, "The Pre-Petition Structure and Operation of the Debtors."

Bayou Management and Bayou Fund are limited liability entities organized under the laws of the State of New York. Bayou Accredited, Bayou Advisors, Bayou Affiliates, Bayou Equities, Bayou Superfund, and Bayou No Leverage are all limited liability entities organized under the laws of the State of Delaware. Bayou Group is a limited liability entity organized under the laws of the State of Connecticut.

Investors in the Bayou Hedge Funds purchased non-voting, redeemable, participating shares in one of the Bayou Hedge Funds by executing a Subscription Agreement. Bayou Fund – the first of the Debtors' hedge funds – was launched by Israel and Marquez in 1996 with $1.2 million in capital. The Bayou Fund was a single-manager hedge fund marketed to "accredited investors" and large institutions. During a corporate reorganization in February 2003, the Bayou Fund was liquidated and four separate on-shore hedge funds were created: Bayou Accredited, Bayou Affiliates, Bayou No Leverage, and Bayou Superfund (collectively, and with the Bayou Fund, the "Bayou Hedge Funds"). Investors were required to transfer their investments in the Bayou Fund to one of the four new hedge funds. Bayou Fund filed a final tax return for year ended 2003 and there have been no further operations.

Between 1996 and 2005, the Debtors' principals also managed and operated various off-shore hedge funds that are exempted limited companies organized and incorporated under the laws of the Cayman Islands, including: Bayou Offshore Fund A, Ltd., Bayou Offshore Fund B, Ltd., Bayou Offshore Fund C, Ltd., and Bayou Offshore Master Feeder Fund, Ltd. (collectively, the "Bayou Off-Shore Funds"). The Bayou Off-Shore Funds are the subject of separate liquidation proceedings as discussed in further detail in Article IV, Section F, "The Debtors' Chapter 11 Cases – Proceedings Involving the Off-Shore Funds."

The following organizational chart illustrates the pre-petition structure of the Debtors and related entities.



B.    The Debtors' Pre-Petition Fraud

The Debtors were operated as a massive fraudulent investment scheme that induced investments of a reported $450 million into the Bayou Hedge Funds and their off-shore counterparts. The Debtors' three pre-petition principals – Israel, Marino, and Marquez – have pleaded guilty to federal securities violations and have admitted the fraud. The details and chronology of the fraud, as the Debtors currently understand them, are as follows.

Within months after the Bayou Fund opened and started trading, it sustained heavy trading losses. In 1997 and 1998, the Bayou Fund lost tens of millions of dollars. In order to conceal those losses, the Debtors began falsifying their financial disclosures and fraudulently misrepresenting their investment performances. In financial summaries sent to clients, the volatile swings of the trading gains and losses were concealed by padding and fabricating the results.

The Bayou Fund's mounting losses could not withstand an independent audit of the year-end 1998 financial results. To avoid detection, the Bayou Fund's independent auditor, Grant Thornton LLP, was terminated. In its place, Marino, a certified public accountant, created a fictitious accounting firm – Richmond-Fairfield Associates, CPA, PLLC ("Richmond-Fairfield") – to pose as the independent auditor. The Bayou Fund was Richmond-Fairfield's only client, and Marino was its only principal. Public records show that Richmond-Fairfield was formed by filing with the New York Department of State on October 10, 2000, long after it was presented to investors as the Bayou Fund's "independent" auditor.

From 1999 to 2003, the Bayou Fund continued to lose substantial amounts of money and never earned a profit. During that time, Israel, Marino, and through October 2001, Marquez, caused the Bayou Fund, under cover of purported "audits" by Richmond-Fairfield, to continue to generate false performance reports and financial statements designed to mislead investors.

During a reorganization in February 2003, the supposedly profitable Bayou Fund was liquidated and four separate on-shore hedge funds were created: Bayou Accredited, Bayou Affiliates, Bayou No Leverage, and Bayou Superfund. Investors were required to transfer their investment in the Bayou Fund to one of the four new Bayou Hedge Funds. The Bayou Fund was closed and final tax returns filed. Each of these four new hedge funds subsequently sustained millions of dollars in losses, which Israel and Marino continued to attempt to conceal through the dissemination of false investment performance reports and false financial statements that purported to be "audited" by Richmond-Fairfield.

In addition, the Bayou Hedge Funds were depleted for the personal financial benefit of the principals of the Debtors. The Bayou Hedge Funds adopted an investment strategy predicated on large numbers of trades involving large amounts of money. This investment strategy was designed to generate a high volume of commissions for Israel's wholly-owned broker-dealer, Bayou Securities, LLC, which executed most of these trades. Bayou Securities was paid tens of millions of dollars in trading commissions, which Israel kept for himself and other principals of the Bayou Hedge Funds to the detriment of investors.

In 2004, the Bayou Hedge Funds attempted to recoup their losses by conducting private placement transactions in the United States and Europe. This action was not disclosed to investors. Instead, the Debtors falsely communicated to investors that trading was still being conducted.

At various times prior to August 2005, certain investors sought to, and did, redeem all or part of their investments in the Bayou Hedge Funds. At the time, the Bayou Hedge Funds' falsified financial statements reported that these redeeming investors' accounts included substantial gains on their investments. In reality, the Bayou Hedge Funds had lost a substantial portion of investors' principal and had not made any profits. A true statement of the redeeming investors' accounts would have shown an amount significantly less than the redeeming investors' principal investments and of course no profits. In an attempt to conceal the ongoing fraud and thereby hinder, delay, or defraud other current and prospective investors, the Debtors paid the redeeming investors the inflated amount reflected in the falsified financial statements, including non-existent principal and fictitious profits, not the redeeming investors' true depleted account balances.

Due to heavy trading losses and the siphoning of additional funds, the Debtors' funds were depleted for purposes of repayment by these redemptions of non-existent principal and fictitious profits to the redeeming investors. Accordingly, the Debtors aggressively pursued new investors, and used the incoming capital from those new investors to continue operations and pay redemption proceeds to investors who sought to exit the Bayou Hedge Funds. The Debtors were able to stay afloat only by using the principal invested by new clients to pay the redeeming investors. In this way, the Debtors operated as a Ponzi scheme.

In August 2005, the Debtors' fraudulent scheme finally collapsed. In a letter dated July 27, 2005, the Debtors abruptly advised their investors that the Bayou Hedge Funds were voluntarily liquidating. All investors were promised a 100% redemption of their investments, which purportedly had grown in value, upon completion of a final audit. In mid-August 2005, the Debtors sent another letter promising all investor creditors that 90% of the total value of their investments would be distributed within one week. Despite this assurance, the Debtors did not repay any additional money to investor creditors. Instead, all of the funds comprising the Bayou Hedge Funds were gone and hundreds of investor creditors were left without any repayment of their investment principal.

C.   Government Prosecution of the Debtors' Pre-Petition Principals, Related Orders of Forfeiture, and Seizure of the More than $100 million from Wachovia Bank Accounts

Following the Bayou Entities' collapse, numerous civil and criminal investigations were commenced by state and federal authorities. In particular, the United States Attorney for the Southern District of New York, the Securities and Exchange Commission, and the Commodity Futures Trading Commission each have commenced separate law enforcement actions against the Bayou Entities, Israel, Marino, Marquez and others alleging violations of numerous laws and regulations.

1.    Debtors' Pre-Petition Principals Plead Guilty

Israel, Marino, and Marquez, have pled guilty in the United States District Court for the Southern District of New York to conspiring to defraud investors in connection with the operations of the Bayou Hedge Funds. Israel and Marino further pled guilty in this District to federal counts of mail and wire fraud, investment advisor fraud, and conspiracy to commit fraud, in connection with their operation of the Bayou Hedge Funds.

During their respective plea allocutions, Israel and Marino both agreed that they:

> caused to be mailed quarterly reports to investors that contained fictitious rates of return on trading in the funds and annual financial statements that contained fictitious rates of return on trading and inflated net asset[] values. [They] also had faxed and mailed weekly newsletters that also misrepresented the performance of the funds at various times during the time period set forth in the information. All these communications to investors [] made it appear that Bayou was earning profits on trading when in fact it was not.

They both further agreed that:

> In furtherance of the scheme and because Bayou could not use an actual certified public accounting firm to audit the funds and certify the annual financial statements, [they] in early 1999 form[ed] a phony accounting firm [] name[d] Richmond Fairfield Associates. Year after year between 1999 and 2004, the co-conspirators had Bayou's false financial statements sent out with a fictitious certification by Richmond Fairfield Associates that the funds had been audited and the financial statements were accurate.

Israel further admitted that this false financial information concerning Bayou's performance was disseminated to "current and prospective clients of Bayou" in order to "induce [] people to invest in Bayou or continue to keep their money in Bayou."

Israel, Marino, and Marquez are awaiting sentencing. As of the date of this Disclosure Statement, Marquez's sentencing is scheduled for July 13, 2007, Marino's sentencing is scheduled for July 20, 2007, and Israel's sentencing is scheduled for September 21, 2007.

2.    Orders of Forfeiture

In connection with the guilty pleas of Israel and Marino, the United States Attorney sought, and the District Court entered, an Order of Forfeiture, which required Israel and Marino to forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all real and personal property that constituted or was derived from the proceeds traceable to the commission of the offenses set forth in the indictment (the "Forfeited Assets"), including specifically "approximately $100,010,673.68" seized by the Arizona Attorney General. A similar order of forfeiture was entered against Marquez in connection with his guilty plea.

In connection with the Order of Forfeiture, James P. Shinehouse of Kroll Worldwide, Inc. was appointed as receiver (the "Government Receiver") to assist the United States Marshals Service and the Office of the United States Attorney in marshaling and liquidating the Forfeited Assets. The Government Receiver has been authorized to take possession and control of the Forfeited Assets and all books and records of the Bayou Entities that were seized by various government entities in their criminal and regulatory investigations. In addition, the Government Receiver is responsible for conducting a forensic investigation and analysis of the financial affairs and corporate dealings of the Bayou Entities and identifying, preserving, marshalling, and disposing of the Forfeited Assets. The Government Receiver has acknowledged, with the consent of the United States Attorney for this District and the United States Marshals Service, that he was not charged with the duty or responsibility to investigate or pursue claims against third parties on behalf of the Debtors related to the Debtors' fraudulent investment scheme.

The Debtors do not have possession or control over the Forfeited Assets, and are not involved in the distribution of the Forfeited Assets. As discussed herein, however, the Plan does take into consideration anticipated distributions of the Forfeited Assets to holders of Claims against the Debtors' Estates.

3.    Government Seizure of More than $100 Million from Wachovia Bank Accounts

On May 19, 2005, the Attorney General of the State of Arizona seized four Wachovia bank accounts in Flemington, New Jersey containing $100,727,434 (the "Seized Funds"). On September 28, 2005, the Arizona Superior Court entered a final Order of Forfeiture relating to those accounts. The Seized Funds were placed in an interest-bearing account under the supervision and control of the Arizona Attorney General.

Pursuant to the Order of Forfeiture, on September 1, 2005, the United States Attorney for the Southern District of New York commenced a civil forfeiture action in the United States District Court for the Southern District of New York to recover the Seized Funds from the Arizona Attorney General. After the Federal Bureau of Investigation submitted facts sufficient to demonstrate that the Seized Funds belong to investor creditors of the Debtors and the Off-Shore Funds, the Arizona Superior Court issued an order directing the transfer of the Seized Funds to the United States Marshals Service. On October 19, 2006, $106,541,628.64 was transferred from the State of Arizona to the United States Marshals Service.

D.    Distributions of the Government Funds to Defrauded Investors

According to the civil forfeiture complaint filed by the United States Attorney for the Southern District of New York, the government will request that all Forfeited Assets, including the Seized Funds and any other forfeited property, be distributed *pro rata* to victims of the fraud perpetrated by the Bayou Entities.

Any distribution of the Forfeited Assets will be made by the United States, and not by the Debtors. The Forfeited Assets belong to the United States and do not constitute property of the Debtors' Estates. The United States has sole and exclusive control over the Forfeited Assets, and the administration and distribution of the Forfeited Assets is entirely separate from and independent of the Debtors' Estates, and indeed independent of the Bankruptcy Court. The

Debtors do not have possession or control over the Forfeited Assets, are not involved in the distribution of the Forfeited Assets, and have no authority or control concerning the timing, amount, or methodology of any distribution of the Forfeited Assets.

The Debtors understand that the United States will distribute the Forfeited Assets pursuant to a Restitution Order, which will be entered contemporaneously with the first sentencing of any of Israel, Marino, and/or Marquez. The Debtors' present understanding is that the Restitution Order may be entered as soon as July 13, 2007, in connection with the scheduled sentencing of Marquez.

The Restitution Order will mandate distribution without reserve for contingent or unliquidated claims. Thus, only investor creditors with actual liquidated, non-contingent claims against the Debtors prior to entry of the Restitution Order will be eligible to participate in the distribution. In other words, the Restitution Order will fix the persons and entities who are identified as victims of the pre-petition Bayou Fraud and to whom distributions of the Forfeited Assets will be made. At the present time, fully redeemed investors that are defendants in the adversary proceedings commenced by the Debtors do not hold liquidated claims, and thus cannot participate in a distribution of the Forfeited Assets. Moreover, the Debtors believe the Restitution Order will not establish a reserve for distributions to persons or entities who are not yet victims of the fraud as of the date of the Restitution Order.

E.    Formation of the Unofficial Creditors Committee

In February 2006, following broad notice to similarly-situated investors in the Bayou Hedge Funds, a group of more than 60 creditors of the Debtors, holding more than $130 million in claims against the Debtors, formed the "Unofficial On-Shore Creditors' Committee of the Bayou Family of Companies" (the "Unofficial Creditors Committee"). On March 27, 2006, the Unofficial Creditors Committee filed a lawsuit (the "Unofficial Creditors Committee Action") in the United States District Court for the Southern District of New York against the Debtors, Israel and Marino, and others asserting violations of federal securities laws and claims for fraud and breach of fiduciary duty, and seeking various forms of equitable relief from the District Court.

F.    Appointment of Sole Managing Member of the Debtors

On March 28, 2006, in connection with the Unofficial Creditors Committee Action, the Unofficial Creditors Committee filed a Motion to Appoint a Receiver for the Debtors. By Order dated April 28, 2006 (the "Appointment Order"), the District Court, pursuant to Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 thereunder, state law claims of fraud and breach of fiduciary duty, 28 U.S.C. §§ 754, 959, and 1692, Federal Rule of Civil Procedure 66, and the court's inherent authority, appointed Jeff J. Marwil (the "Marwil" or the "Sole Managing Member") both as a "federal equity receiver" and "the sole and exclusive managing member" of each of the Debtors. With respect to the Debtors' corporate management, the Appointment Order decreed that:

> Pursuant to 28 U.S.C. § 959(b), [Marwil shall] succeed to be the sole and exclusive managing member and representative of each of the Bayou Entities with the sole and exclusive power and authority

to manage and direct the business and financial affairs of the
Bayou Entities, including without limitation, the authority to
petition for protection under the Bankruptcy Code, 11 U.S.C. §§
101 *et seq.* (the "Code"), for any or of the Bayou Entities and in
connection therewith be and be deemed a debtor-in-possession for
any and all of the Bayou Entities in proceedings under Chapter 11
of the Code, and prosecute such adversary proceedings and other
matters as may be permitted under the Code and/or applicable law.

The Appointment Order authorized and directed the Sole Managing Member, as
corporate management of the Debtors, to "take any and all actions necessary and proper"
towards, among other things, "locating, preserving, and protecting" the Debtors' assets and
"distributing" the Debtors' assets "as expeditiously as possible." Among the duties charged to
the Sole Managing Member, on behalf of the Debtors, was the prosecution of fraudulent
conveyance claims.

Pursuant to the Appointment Order, the Debtors' assets include: (a) all claims, demands,
or causes of action of the Debtors against third parties, including but not limited to any
avoidance actions under Chapter 5 of the Bankruptcy Code, applicable state fraudulent transfer
law or applicable state common law (specifically including causes of action against redemption
recipients), and (b) any real property, equitable property, tangible and intangible personal
property, interests, or assets of any nature, wherever located; specifically excluding any assets
subject to the an order of civil or criminal forfeiture and any asset of the Off-Shore Funds'
Estates.

As noted above, the Debtors have not located assets other than the legal claims, including
fraudulent transfer claims.

## IV.    THE DEBTORS' CHAPTER 11 CASES

A.    Commencement of the Chapter 11 Cases

On May 30, 2006, at the direction of the Sole Managing Member, each of the Debtors
filed separate voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the
United States Bankruptcy Court for the Southern District of New York, White Plains Division.
Pursuant to Bankruptcy Rule 1015(b), the Debtors' cases have been procedurally consolidated
and are being jointly administered by the Bankruptcy Court. As of the date hereof, under the
control of the Debtors' Sole Managing Member, the Debtors are debtors-in-possession pursuant
to Bankruptcy Code §§ 1107 and 1108. No trustee or examiner has been appointed in these
cases.

As of the Petition Date, the Debtors did not have any cash-on-hand or other real, personal,
or other property. The Debtors' only assets as of the Petition Date were, and continue to be, the
Debtors' legal claims against third parties and the proceeds from such claims.

The Debtors commenced these Cases in order to, among other things, (a) investigate and
pursue causes of action against various third parties in order (i) to assure an equality of