UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—— —— ———— ——— ——— ————x

IN RE BAYOU HEDGE FUND LITIGATION                        06-MDL-1755 (CM)

—— ———— ———— ——— ——— ——x

THIS DOCUMENT RELATES TO:

—— ——— — ———— ——— ——— —— ——x

SOUTH CHERRY STREET LLC,

       Plaintiff,                                           06-CV-2943 (CM)

   -against-

HENNESSEE GROUP LLC, ELIZABETH
LEE HENNESSEE and CHARLES A.
GRADANTE,

       Defendants.

—— ——— - ——— ——— ——— ——— ——x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

## DECISION AND ORDER
## GRANTING DEFENDANTS' MOTION TO DISMISS

McMahon, J.:

    Plaintiff South Cherry Street, LLC ("South Cherry") brings this action against defendants

Hennessee Group, LLC ("Hennessee Group"), Elizabeth Lee Hennessee and Charles J. Gradante,

alleging that all three defendants violated Section 10(b) of the Securities Exchange Act of 1934,

and that Hennessee Group breached its investment advisory contract with South Cherry and

breached its fiduciary duty to plaintiff.

    This lawsuit stems from the massive fraud associated with Bayou Group, LLC ("Bayou

Group"), an affiliated group of legal entities based in Connecticut that created and managed

private pooled investment funds, or hedge funds.[1] Bayou Group's principals, Samuel Israel III and Daniel E. Marino, operated Bayou Group as a fraudulent Ponzi scheme and, by August 2005, Bayou Group collapsed under the weight of its principals' fraudulent acts.

South Cherry was one of Bayou Group's investors, having invested $1.15 million in one of Bayou Group's affiliates - Bayou Accredited, LLC ("Bayou Accredited") – from March 2003 to October 2004. According to the Complaint, South Cherry's investment came at the recommendation of Hennessee Group, an investment advisor specializing in hedge funds. According to South Cherry, Hennessee Group represented that it conducted a rigorous five-step due diligence review of a hedge fund before recommending that a client invest in that particular fund. South Cherry further alleges that positive reports issued by Hennessee Group regarding Bayou Accredited – that were later shown to be inaccurate following discovery of the fraud – clearly demonstrate that the Group either did not conduct the promised due diligence on Bayou Accredited, or did so in a deficient manner.

Approximately eight months after the Bayou Group fraud became public knowledge, plaintiff commenced the instant lawsuit. Before this court is defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted. For the reasons stated below, defendants' motion is granted.

---

[1] Bayou Group consists of ten separate entities: Bayou Advisors, LLC, Bayou Equities, LLC, Bayou Superfund. LLC, Bayou No Leverage Fund, LLC, Bayou Affiliates Fund, LLC, and Bayou Accredited Fund, LLC – all Delaware Limited Liability Companies; Bayou Management, LLC, Bayou Securities, LLC, and Bayou Fund, LLC all New York Limited Liability Companies; and Bayou Group, LLC - a Connecticut Limited Liability Company.

2

## I. <u>Background</u>

The following well-pleaded facts are presumed true.

### A. *The Hennessee Group Investor Presentation*

Sometime after August 2001, Hennessee Group mailed a written presentation to South

Cherry's sole shareholder, Fred Groothuis, entitled, "Hennessee Hedge Fund Advisory Group

Investor Presentation" ("Hennessee Investor Presentation").[2] (Compl. ¶ 21; <u>see also</u> Hennessee

Investor Presentation, attached as Ex. A to Declaration of Fred Groothuis ("Groothuis Decl.").)

The Hennessee Investor Presentation described the Group as a "'strategic partner in hedge fund

investing'" and an "'Industry Leader: the most recognized hedge fund consulting firm in the

industry,'" whose Hennessee Hedge Fund Indices are "'the oldest, most widely sourced hedge

fund index in the financial industry.'" (Compl. ¶¶ 12-13, quoting Hennessee Investor Presentation

at 6.) The Presentation further represented that the Group's principals, Hennessee and Gradante,

were "'early pioneers in the [hedge fund] industry,'" who had "'150 direct relationships with

hedge funds.'" (<u>Id.</u> ¶ 13, quoting Hennessee Investor Presentation at 6.)

Most significant to plaintiff's Complaint, the Hennessee Investor Presentation outlined the

---

[2] This initial communication apparently occurred after Hennessee Group met with Craig
Bollman, a secured creditor of South Cherry. Several pages of plaintiff's Complaint are devoted
to communications between defendants and Mr. Bollman. (<u>See</u> Compl. ¶¶ 12-20.) However,
prior to the instant motion, defendants moved this court to compel arbitration pursuant to an
arbitration clause in an executed Investment Advisory Agreement, between Mr. Bollman and
Hennessee Group. That motion was denied on December 5, 2006. This court specifically found
that Mr. Bollman was never an employee or agent of South Cherry's, nor was he ever authorized
to make investments or enter contracts on South Cherry's behalf, and the Agreement's arbitration
clause was therefore not binding on South Cherry. (<u>See</u> Mem. Order Denying Defs.' Mot. to
Compel Arbitration, attached as Ex. D to Declaration of Matthew Wolper ("Wolper Decl."), at
5.) Accordingly, any alleged representations made by defendants to Ms. Bollman, and any
agreements between Mr. Bollman and Hennessee Group, are irrelevant to this motion. South
Cherry's opposition papers do not contend otherwise.

Group's five-step due diligence process that the Group conducts before recommending that a client invest in a particular hedge fund. Before Hennessee Group subjects a hedge fund to its due diligence review, however, the Presentation indicated that the fund needed to meet several minimum requirements. One of these requirements was that the fund should have "'3 years audited track record.'" (Id. ¶ 15, quoting Hennessee Investor Presentation at 8.)

Assuming the hedge fund meets this and other threshold requirements, Level One of the process entails sending a Manager Information Sheet ("MIS") to the manager of the hedge fund being reviewed. The MIS requests general information about the fund, including "sources of capital," "performance [including audits and monthly historical performances]," "vehicle structure," "tax efficiency," "associated professionals [including the fund's legal, tax and audit teams]," and "SEC [history]." (Hennessee Investor Presentation at 10-11.) Level One also includes a review of the completed MIS, and a determination by the Group whether to proceed to Level Two. (Id. at 10.)

Level Two of Hennessee Group's due diligence includes assessing the hedge fund's "experience," "credibility," and "transparency." (Id. at 11.) At this level, the Group also generates an "internal quantitative analysis" of the hedge fund, and schedules a meeting with the fund's manager and research staff. (Id.)

For those hedge funds satisfying Level Two review, Level Three requires an on-site meeting at the fund manager's office so that Hennessee Group could "'interact with [hedge fund] Personnel from the top down to develop an impression of overall professionalism, attitude and depth of organization.'" (Compl. ¶ 17, quoting Hennessee Investor Presentation at 12.) The on-site meeting also helps the Group assess certain "qualitative aspects" of the fund, including its

4

"systems," "culture," and "environment." (Hennessee Investor Presentation at 12.)  South Cherry alleges that Hennessee Group did not have a face-to-face meeting with Bayou Accredited until long after the Group recommended the hedge fund to South Cherry. (Compl. ¶ 17.)

During Level Four of the due diligence process, Hennessee Group "studied the hedge fund's 'individual positions,' with an emphasis on its long, short, cash and derivative positions, as well as any 'off balance sheet transactions.'" (Id. ¶ 18, quoting Hennessee Investor Presentation at 12.)  Level Four also required the Group to analyze the fund's "individual holdings," "average holding period," and "beta, market capitalization and trade days of portfolio," (Hennessee Investor Presentation at 12), "all factors in determining the degree of risk in the hedge fund's investment." (Compl. ¶ 18.)

If a hedge fund passed these four stages of review, the Hennessee Investor Presentation stated that the fund was subject to Level Five, the final due diligence stage. According to the Presentation, Level Five scrutiny required the Group to conduct a "legal/audit review," that included analysis of the fund's "audited financial statements" and "offering memorandum and limited partnership agreements." (Hennessee Investor Presentation at 13.) During Level Five review, the Group also performed an "internal background check" on fund personnel, confirmed the fund's prime banking relationship, and contacted the prior employers of the fund's key employees. (Compl. ¶ 19.) The Presentation also indicated that the Group would "'verify'" the hedge fund's auditor. (Id., quoting Hennessee Investor Presentation at 13.) Hennessee Group also reserved the option to retain a private investigator to perform additional due diligence as circumstances warranted. (Id.)

In addition to the five-step due diligence process, the Hennessee Investor Presentation also

represented that the Hennessee Group conducts ongoing due diligence, after the Group has
recommended that its clients invest in a particular hedge fund.  According to the Presentation, the
Group's ongoing due diligence includes scrutinizing the fund's performance figures and audited
financial statements, and compiling monthly portfolio reports.  (Id. ¶ 20.)  The process also
monitors "'style drift'" – i.e., any variation from a plan in a fund's investment activities.  (Id.,
quoting Hennessee Investor Presentation at 14.)

Thus, according to the Complaint, the Presentation represented that Hennessee Group
"evaluated all candidate hedge funds after each level of due diligence review, and that a hedge
fund would have to pass all five levels of due diligence before Hennessee Group would
recommend the hedge fund to a client."  (Id. ¶ 15.)  Moreover, if the fund did not pass any single
level of the five level process, it would not be passed onto the next level of inquiry and, therefore,
could not be recommended to a client.  (Id. ¶ 15.)

According to the Complaint, the Hennessee Investor Presentation, "was specifically
intended to induce prospective customers to trust in Hennessee Group's promised extensive due
diligence process, and Groothuis relied upon its representations . . . when he decided to invest
South Cherry's assets in hedge funds, including Bayou [Accredited], that Hennessee Group
recommended."  (Id. ¶ 21; see also id. ¶ 8.)  Moreover,

> it was absolutely material to South Cherry – which was otherwise inexperienced in
> hedge fund investing – that Hennessee Group have conducted a disciplined and
> complete due diligence process on all recommended investments in hedge funds.
> Absent Hennessee Group's representation to South Cherry that it conducted the
> detailed five level due diligence process, and its agreement to conduct the post-
> investment ongoing due diligence process set forth in the . . . Presentation and
> elsewhere, South Cherry would not have opened a Hennessee Group account, and
> would not have invested [in] any hedge fund recommended by Hennessee Group,
> including Bayou [Accredited].

6

(Id. ¶ 10; see also id. ¶ 8.)

## B. Hennessee Group's Alleged Misrepresentations Regarding Bayou Accredited and Bayou Fund

In addition to its alleged misrepresentations regarding its five-step due diligence process and ongoing due diligence, Hennessee Group allegedly misrepresented facts to South Cherry concerning Bayou Accredited and its predecessor, Bayou Fund LLC ("Bayou Fund") – misrepresentations that South Cherry alleges were incorrect precisely because the Group never conducted its promised due diligence.

### 1. Bayou Accredited's Accountant

Bayou Accredited was formed in January 2003, following the decision of Israel and Marino to replace Bayou Fund "with the several Bayou Family Funds."[3] (Id. ¶ 23.) Bayou Fund had been formed in 1996 and, according to the Complaint, "consistently lost money." (Id.) In order to hide this fact, in 1998, Israel and Marino fired Bayou Fund's hedge fund auditor, Hertz Herson & Co. ("HHCO") and replaced it with "a fake, but purportedly independent, accounting firm, Richmond, Fairfield & Associates ("Richmond-Fairfield")." (Id.) Even though HHCO stopped auditing Bayou Fund in 1998 and never audited any of the Bayou Family Funds established in 2003, Hennessee Group's Vice President, Leeana Piscopo, represented to South Cherry in a February 2003 mailing that Bayou Accredited was audited by HHCO. (Id.)

South Cherry alleges that this false statement demonstrates that Hennessee Group never

---

[3] For the purposes of this opinion, "Bayou Accredited" refers to Bayou Accredited, LLC, "Bayou Fund" refers to the original hedge fund Bayou Fund, LLC, "Bayou Family Funds" refers to the hedge funds established in 2003 to replace Bayou Fund (including Bayou Accredited), and "Bayou" refers collectively to all of the Bayou entities.

7

conducted the due diligence it promised. According to the Complaint, if the Group had taken steps to "'verify'" Bayou's auditors, as promised, it would have learned that HHCO no longer worked for any Bayou entities, and that Richmond-Fairfield's registered principal was Marino and the firm was therefore not a genuine auditor, "could not possibly have been independent," and "never did any auditing." (Id. ¶¶ 24, 27.) South Cherry further alleges that Hennessee Group "never had any contact with Richmond-Fairfield," and that it did not properly investigate the purported accounting firm even after one of the Group's investors warned the Group that the firm was not a true independent auditor. (Id. ¶ 27.) Moreover, South Cherry alleges that even if Bayou Accredited employed a proper, independent accountant, it was not possible for Bayou Accredited – formed in January 2003 – to have three years of audited financial statements by the time Hennessee Group recommended the fund in early 2003. (Id.)

### 2. Bayou Fund's Profitability

In that same February 2003 mailing from Hennessee Group to South Cherry, the Group represented that Bayou Accredited's predecessor, Bayou Fund, had been launched in January 1997, it had a greater than 19% annualized return since its inception, and that it was profitable in 78% of the months since its inception. (Id. ¶ 26.) South Cherry alleges that all of these statements were false – Bayou Fund was formed in 1996 and had consistently lost money since its inception – and the statements further demonstrate that Hennessee Group never conducted the due diligence it promised. (Id.; see also id. ¶ 28.)

### 3. Bayou Accredited's Principal

The February 2003 mailing from Hennessee Group to South Cherry also included a written "'Biography'" of Mr. Israel, Bayou Accredited's "'Founder & Principal.'" (Id. ¶ 29.) According

8

to the biography, prior to forming Bayou Fund, Mr. Israel was "'head trader for Omega Advisors, managing assets exceeding \$4 billion for Leon Cooperman." (Id.) South Cherry asserts that this representation was particularly impressive as Omega Advisors is one of the hedge fund industry's most successful funds, and Mr. Cooperman is widely admired as a "'legendary'" trader; accordingly, South Cherry claims that it relied on this biography when it decided to invest in Bayou Accredited. (Id.)

Again, South Cherry alleges that had Hennessee Group conducted the due diligence it promised, the Group would have discovered that much of the information in its Israel biography was incorrect. According to the Complaint, Mr. Israel was never Omega Advisors's head trader, and never held any position remotely comparable. (Id. ¶ 30.) Indeed, Mr. Cooperman has since described Israel as an "'order taker.'" (Id.) Thus, South Cherry alleges, the Group's background check on Mr. Israel was either never performed or "woefully deficient." (Id.)

### 4. Bayou Accredited's Investment Strategy

South Cherry also alleges that on February 6, 2003, Ms. Piscopo emailed Mr. Groothuis with incorrect information regarding Bayou Accredited's investment strategy. The email advised Groothuis that Bayou Accredited tracks "'250 stocks,'" that the fund "'will have 50+ investment ideas and because may times they don't get their target price, they only put on 20-30 trades in one day,'" that the fund "'rarely use[s] any leverage at all,'" and that it "'employ[s] stop-loss orders on all securities [Bayou Accredited] trade[s].'" (Id. ¶ 31.)

Again, South Cherry alleges that if Hennessee Group had conducted the promised due diligence, it would have discovered that all of these representations were "false or misleading." (Id.) In support of this contention, South Cherry cites an SEC report that found that the Bayou

9

Fund began losing money shortly after its inception in 1996, that Messrs. Israel and Marino began

lying to investors regarding the Bayou Fund's performance at this time, and that Israel and Marino

misappropriated investors' funds from the Bayou Fund and, beginning in 2003, the four successor

funds (including Bayou Accredited).  (Id.)

### C.  *South Cherry Invests in Bayou Accredited*

Sometime between January 1 and March 3, 2003, Hennessee Group recommended to

South Cherry that it invest in Bayou Accredited.  (See id. ¶¶ 23, 25, 32.)  South Cherry alleges that

in reliance on Hennessee Group's recommendation, "and in specific reliance" on its understanding

that Bayou Accredited "had passed all stages" of the Group's five-step due diligence process,

South Cherry invested $2.9 million in Bayou Accredited over the period March 3, 2003 through

June 1, 2003.  (Id. ¶ 32.)  In Spring 2004, South Cherry withdrew $1.75 million, but on October 5,

2004, South Cherry invested an additional $900,000 in Bayou Accredited, for a total net

investment of $1.15 million.  (Id.)

### D.  *Hennessee Group's Ongoing Due Diligence*

South Cherry states that it continued to invest in Bayou Accredited in reliance on

Hennessee Group's assurance that it would conduct ongoing due diligence on the fund.  (Id. ¶ 33.)

During the period from South Cherry's first investment in March 2003 through at least

July 2005, Hennessee Group mailed regularly monthly reports entitled "Manager Performance

Monitor" to South Cherry.  (Id.; see also Manager Performance Monitors, attached as Ex. B to

Groothuis Decl.)  These Manager Performance Monitors are identical in form to the sample report

included in the "Ongoing Due Diligence" section of the Hennessee Investor Presentation.

(Compare Manager Performance Monitors with Hennessee Investor Presentation at 14-15.)  Just

before the Bayou fraud was discovered, Hennessee Group reported to South Cherry that its $1.15 million investment had appreciated to approximately $1.5 million. (Compl. ¶ 33.)

South Cherry alleges that these Manager Performance Monitors were incorrect and that "none of the . . . reports disclosed the fact that Bayou was a fraudulent scheme." (Id. ¶ 34.) Indeed, because Bayou Accredited was part of a criminal Ponzi scheme, South Cherry alleges that its investments in Bayou securities were at all times essentially worthless. (Id.) In support of these allegations, South Cherry again cites to a September 2005 SEC report that stated that Messrs. Israel and Marino began diverting funds from all Bayou entities in 2003, in order to invest the money in private placements of non-public start-up companies. (Id.) The SEC report also found that as of April 2004, Israel and Marino stopped trading in Bayou Accredited's accounts, and instead wired all of the fund's remaining assets into another company's Citibank account. (Id. ¶ 35.) South Cherry claims that Hennessee Group did not report any of these activities to its clients, "even though a review of statements from Bayou's prime banker . . . would have disclosed that Bayou had stopped trading and had drained its accounts." (Id.) Thus, long after Bayou Accredited stopped trading in April 2004, Hennessee Group "continued to express positive views" of the fund, which resulted in South Cherry's $900,000 investment in October 2004. (Id.)

### E. The Bayou Fraud is Discovered

On July 27, 2005, Mr. Israel wrote to all Bayou investors, including South Cherry, that the Bayou entities would be liquidated, and that each investor's capital balance would be distributed by the end of August 2005. No distribution was ever made. (Id. ¶ 36.)

Following this correspondence, various state and federal regulators commenced investigations into Bayou's activities. Messrs. Israel, Marino and James Marquez · a third Bayou

11

principal – were subsequently indicted and pled guilty to security fraud. The Arizona Attorney General discovered approximately $101 million that had been "wire transferred repeatedly among different banks around the world, and caused that money . . . to be frozen pending further proceedings." (Id. ¶ 37.) Other monies were found to be invested in speculative vehicles by entities owned by Israel and Marino, but in which Bayou investors, like South Cherry, had no interest. (Id.) The Department of Justice and other law enforcement agencies report that they are seeking to forfeit these assets, to the extent they can be located and seized. (Id.)

### F. Procedural History

On April 16, 2006, South Cherry filed its original Complaint. Defendants subsequently filed a motion to compel arbitration pursuant to an arbitration clause in an executed Investment Advisory Agreement, between Mr. Bollman and Hennessee Group. The motion was denied on December 5, 2006, on the basis that Mr. Bollman was not an employee or agent of South Cherry's when he entered into the Agreement, and the Agreement's arbitration clause was therefore not binding on South Cherry.

On February 27, 2007, South Cherry filed an Amended Complaint, alleging three causes of action: 1) violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j)(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 (against all defendants), 2) breach of contract (against Hennessee Group), and 3) breach of fiduciary duty (against Hennessee Group). On April 6, 2007, defendants filed the instant motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted.

12

## II. Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." Frasier v. General Elec. Co., 930 F.2d 1004, 1007 (2d Cir. 1991). The court is also required to read a complaint generously, drawing all reasonable inferences from its allegations in favor of the plaintiff. California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 515 (1972).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." Id. at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Iqbal v. Hasty, --- F.3d ---, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007).

In deciding a motion to dismiss, this court may consider the full text of documents that are quoted in the complaint or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000); San Leandro Emerg. Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996).

### III. Discussion

#### A. Violation of Section 10(b) of the Securities Exchange Act of 1934

Defendants argue that South Cherry's § 10(b) claim must be dismissed for two reasons:

First, defendants contend that South Cherry failed to plead fraud against all three defendants with the particularity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). Specifically, defendants maintain that the Complaint only alleges that Hennessee Group made representations regarding its due diligence to Mr. Bollman, and that the Hennessee Investor Presentation was merely a marketing tool. In addition, defendants argue that plaintiff's allegation that Hennessee Group committed a § 10(b) violation by failing to uncover a fraud that Bayou's principals successfully concealed from the entire world for nine years, does not allege the level of recklessness required for a § 10(b) violation. Second, defendants claim that the Complaint fails to plead loss causation.

Because this court finds that the Complaint fails adequately to plead scienter, defendants' argument regarding loss causation need not be addressed.

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent activities in connection with securities transactions. Section 20(a) of the Exchange Act, moreover, imposes joint and several liability on, "Every person who, directly or indirectly, controls any person liable" under § 10(b) or 10b-5. 15 U.S.C. § 78t(a). In order to state a claim under Rule 10b-5, a plaintiff "must plead that in connection with the purchase or sale of securities, the defendant, *acting with scienter*, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury." Acito v. IMCERA Group,

14

Inc., 47 F.3d 47, 52 (2d Cir. 1995) (internal quotations marks and citations omitted) (emphasis added); see also In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 226 (S.D.N.Y. 2006).

It is the scienter element of this pleading requirement on which this court will focus.

While Fed. R. Civ. P. 9(b) states that "malice, intent, knowledge or other conditions of mind" may be "averred generally," the PSLRA and long-standing law in this Circuit impose more stringent requirements for pleading securities fraud. See Veeco Instruments, 235 F.R.D. at 230; see also In re Carter-Wallace, Inc., Secs. Litig., 220 F.3d 36, 39 (2d Cir. 2000) ("the relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license to base claims of fraud on speculation and conclusory allegations."). Thus, in order to state a claim under § 10(b) and Rule 10b-5, the PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In this Circuit, the required state of mind has been defined as "intent to deceive, manipulate, or defraud, or reckless conduct," ATSI Communications. Inc. v. Shaar Fund. Ltd., --- F.3d ---, 2007 WL 1989336, at *6 n.3 (2d Cir. Jul. 11, 2007), and the PSLRA's requisite 'strong inference' arises where plaintiffs allege either "(1) facts showing that defendants had both motive and opportunity to commit fraud, or (2) facts constituting strong circumstantial evidence of conscious misbehavior or recklessness." Gabriel Capital, L.P. v. Natwest Finance, Inc., 137 F. Supp. 2d 251, 261 (S.D.N.Y. 2000); see also Ganino v. Citizens Utilities Co., 228 F.3d 154, 168-69 (2d Cir. 2000).

South Cherry's Complaint alleges that Hennessee Group's misconduct falls into the latter category – that the Group acted recklessly when it failed to uncover the Bayou fraud after it promised to conduct due diligence on Bayou Accredited. (See Compl. ¶¶ 7, 23, 26, 28, 30.)

15

The Second Circuit has defined recklessness as conduct that is "highly unreasonable," and that represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Veeco Instruments, 235 F.R.D. at 230-31 (internal quotation marks and citations omitted). However, while reckless conduct may satisfy the scienter requirement of § 10(b) and Rule 10b-5, "the complaint must make clear that more than mere negligence is alleged." Modern Settings, Inc. v. Prudential-Bache Secs., Inc., 603 F. Supp. 370, 372 (S.D.N.Y. 1985). Thus, conclusory "allegations that a defendant 'knew or [was] reckless in not knowing' the true facts will not satisfy a plaintiff's pleading requirements." Hart v. Internet Wire, Inc., 145 F. Supp. 2d 360, 365 (S.D.N.Y. 2001) (quoting Shields v. Citytrust Bancorp. Inc., 25 F.3d 1124, 1129 (2d Cir. 1994)). "Even an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts." Id. at 368-69 (internal quotation marks and citations omitted).

Notably, "Where a plaintiff relies on allegations of recklessness – as opposed to motive and opportunity – to plead fraudulent intent, the strength of the circumstantial allegations must be correspondingly greater," Gabriel Capital, 137 F. Supp. 2d at 264; see also Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001). "and the plaintiff must allege facts approaching *a knowledgeable participation in the fraud or a deliberate and conscious disregard of facts.*" Hart, 145 F. Supp. 2d at 367 (emphasis added).

In addition to this increased pleading requirements for § 10(b) violations based on recklessness, plaintiffs must also satisfy the heightened standard recently announced by the Supreme Court in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007). In

16

Tellabs, the Court held that when a court examines "whether the pleaded facts give rise to a 'strong' inference of scienter," under the PSLRA, "the court must take into account plausible opposing inferences." Id. at 2509. Moreover, for an inference of scienter to be "strong," the inference "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510.[4]

Thus, a plaintiff pleading a § 10(b) violation based on defendant's recklessness faces two stiff challenges in this Circuit: the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences. South Cherry's Complaint does not meet the test.

South Cherry alleges three categories of misrepresentations made by Hennessee Group.

First, South Cherry alleges that Hennessee Group provided incorrect information to South Cherry about Bayou Fund's profitability. (See Compl. ¶¶ 26, 28.) But any representations regarding Bayou Fund are irrelevant, because the Complaint does not allege that Hennessee Group ever recommended that South Cherry invest in Bayou Fund. And South Cherry does not rely on

---

[4] In reaching this decision, the Court noted that it had "previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5." Tellabs, 127 S. Ct. at 2507, n.3. Accordingly, the "question whether and when recklessness satisfies the scienter requirement is not presented in this case." Id. However, the PSLRA's "strong inference" pleading requirement does not carve out an exception for § 10(b) cases based on recklessness, and the Supreme Court did not exempt allegations of recklessness from the PSLRA's heightened pleading requirements when it interpreted the statute in Tellabs. Until the Supreme Court comes down one way or the other on whether recklessness is enough for scienter, I must follow Second Circuit law, which permits plaintiffs to plead reckless behavior in support of § 10(b) liability, and I must apply the heightened pleading requirement announced in Tellabs to such pleadings.

17

these misrepresentations to obtain relief.  (See infra.)

Second. South Cherry alleges that the Group provided incorrect information to plaintiff about the independence of Bayou Accredited's accountant, the experience of its principal, Israel, and the fund's investment strategy.  (See Compl. ¶¶ 23-24, 27, 29-31.)  However, South Cherry concedes in its opposition papers that it does not seek relief under § 10(b) for these misrepresentations either.

Instead, South Cherry states, "The gravamen of the Amended Complaint is simply that Defendant defrauded South Cherry by representing that before recommending the Bayou investment to South Cherry, Hennessee Group had conducted a great deal of very specific due diligence about Bayou that it simply did not do."  (See Pl.'s Opp. Br. at 6.)

Third. South Cherry alleges that Hennessee Group promised to conduct a five-step due diligence process before recommending a hedge fund for investment (and to perform ongoing due diligence after recommending a fund).  The Complaint alleges the Group failed to do either.  (See Compl. ¶¶ 14-22, 33-35.)  South Cherry's Complaint suggests that Hennessee Group's failure to conduct any semblance of "rudimentary" due diligence – let alone the Group's unique five-step process – not only led to its failure to uncover reasons why Bayou was not a sound investment, but also fell short of prevailing industry standards, which constitutes evidence of defendants' recklessness.  (See id. ¶¶ 24, 26, 28, 30.)  Put otherwise, South Cherry thus argues that Hennessee Group assumed both an initial and ongoing duty to South Cherry to investigate Bayou thoroughly, that its failure to uncover the Bayou fraud demonstrates that it breached that duty, and that the breach of duty demonstrates the requisite recklessness.  (Pl.'s Opp. Br. at 9, 19-20.)

The allegation that Hennessee Group promised to conduct a uniquely comprehensive

brand of due diligence but failed to do so is insufficient to establish the requisite strong inference of conscious recklessness. "It is . . . unfair to use professionals' *self-imposed standards*, which may exceed industry standards, against them to try to prove fraud. This violates public policy which encourages the highest standards, in order to protect the public." Hart, 145 F. Supp. 2d at 370 (quoting In re Worlds of Wonder Sec. Litig., 147 F.R.D. 214, 217 (N.D.Cal. 1992)) (emphasis added). "Courts have refused to assign 10b-5 liability merely for a violation of a defendant's standard practices and procedures." Id. at 369.

Even South Cherry's alternative allegation that Hennessee Group failed to perform due diligence commensurate with industry standards is inadequate to plead scienter. See, e.g., Stevelman v. Alias Research Inc., 174 F.3d 79 (2d Cir. 1999) (noting violations of industry standards are not enough to show scienter); Chill v. General Elec. Co., 101 F.3d 263, 270 (2d Cir. 1996) (finding that "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim."); Gabriel Capital, 137 F. Supp. 2d at 264 ("An investment advisor is retained to suggest appropriate investments for its clients, but is not required to assume the role of accountant or private investigator and conduct a thorough investigation of the accuracy of the facts contained in the documents that it analyzes for the purpose of recommending an investment."); In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194 (S.D.N.Y. 1999) (finding that violations of company's accounting policies and various professional standards, without proof of intent to defraud, were not sufficient to allege fraud under § 10(b)).

All of the pre-Tellabs law in this Circuit requires a PSLRA pleader who relies on recklessness to establish scienter to plead stronger allegations than a plaintiff who alleges motive

and opportunity to participate in the fraud. See Gabriel Capital, 137 F. Supp. 2d at 264. Even if using professionals' self-imposed standards against them to prove fraud were acceptable, Hennessee Group's alleged failure to conduct promised due diligence would still fall short of alleging the requisite scienter because the allegation fails to "show that the defendants acted with fraudulent intent" (i.e., the intention of deceiving the plaintiff), as they must, "even when plaintiff[] rel[ies] on the 'recklessness' prong of scienter." Hart, 145 F. Supp. 2d at 365 (noting § 10(b) complaint based on recklessness that "fails to adduce any specific facts supporting an inference of *knowledgeable participation* in the alleged fraud will not survive a motion to dismiss.") (internal quotation marks and citations omitted) (emphasis in original); see also Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000) (observing "conscious recklessness" is "a state of mind approximating actual intent, and not merely a heightened form of negligence") (internal quotation marks and citations omitted).

The failure to conduct due diligence is not the same thing as knowing of or closing one's eyes to a known "danger," or participating in the fraud. "Where third-party advisers are concerned, to meet such a standard the allegations must approximate an actual intent to aid in the fraud being perpetrated by the . . . company." Gabriel Capital, 137 F. Supp. 2d at 263-64 (internal quotation marks and citations omitted). South Cherry does not allege that Hennessee Group knew, or even suspected, that Bayou Accredited was a fraudulent enterprise but "deliberately shut [its] eyes to the facts." Hart, 145 F. Supp. 2d at 365. Neither does plaintiff allege that the Group recommended investing in Bayou Accredited with intent to cause plaintiff to lose money or to assist in the fraud being perpetrated by Bayou. Indeed, South Cherry alleges no facts that suggest Hennessee Group, knowing or suspecting that Bayou was a Ponzi scheme, intended to deceive

20

South Cherry into believing Bayou Accredited was a sound investment. Without alleging such facts, the mere allegation that Hennessee Group failed to follow through on its promise to conduct due diligence (which I assume to be true) falls short of providing a sufficiently strong inference of recklessness. See id. at 365 (granting motion to dismiss where plaintiff investors in company sued wire service for publishing fraudulent – and negative – press release written by disgruntled company employee, where plaintiffs alleged it was defendant's standard practice to confirm press releases).

Tellabs – which requires this court to examine competing inferences when determining whether scienter has been adequately pled – only buttresses this conclusion. South Cherry argues that this court may draw a strong inference of recklessness from the allegation that Hennessee Group recommended (and continued to recommend) Bayou Accredited at a time when Accredited was part of a large Ponzi scheme operated by Bayou's principals. From this, plaintiff asserts, the Group could not possibly have conducted the due diligence it promised. (Pl.'s Opp. Br. at 9-10; see also Compl. ¶¶ 7, 23, 30.)

But according to the Complaint, "Bayou was at all relevant times a criminal Ponzi scheme," (id. at ¶ 33), and the fraud was not discovered until "subsequent to" the mailing of a July 27, 2005 letter from Israel to Bayou investors, (see id. ¶¶ 36-37), despite the fact that it "had been formed in 1996, and had . . . . lost millions of dollars in every single year it traded." (Id. ¶¶ 23, 28.)

One substantial competing inference this court may draw from these alleged facts is that due diligence would not have uncovered the fraud. The Complaint alleges that Bayou concealed the fraud from investors, the public, investment advisors, other industry professionals and

21

regulators – including the SEC – for *nine years.* Given that Israel and Marino managed to deceive
the entire investing community for nearly a decade, South Cherry's allegation that Hennessee
Group would necessarily have uncovered the fraud had it conducted the due diligence it promised
is far from compelling.

I therefore find the inference of recklessness alleged by plaintiff – that the Group's failure
to uncover the fraud evidences a reckless lack of due diligence – to be less compelling than an
opposing inference – that Hennessee Group's failure to discover the fraud merely places it
alongside the SEC, the IRS, and every other interested party that reviewed Bayou's finances. The
inference proposed by South Cherry is thus not "strong in light of other explanations," and its
pleading cannot survive a motion to dismiss. Tellabs, 127 S. Ct. at 2510; see also Modern
Settings, 603 F. Supp. at 372 (granting motion to dismiss § 10(b) claim, where defendant account
manager promised to take precautions to insure correct valuation, and plaintiffs alleged
defendant's misvaluation of plaintiffs' assets evidenced recklessness, noting, "the mere
occurrence of the error is not sufficient to justify the inference that the promised [precautions
were] not being employed.")

South Cherry also argues that "defendants' continued misrepresentations over a period of
years . . . is just another indication of defendants' scienter." (Pl.'s Opp. Br. at 9.) But Hennessee
Group's purported misrepresentations regarding the soundness of Bayou Fund and Bayou
Accredited do not form the basis of plaintiff's § 10(b) cause of action – they merely provide the
context against which plaintiff has attempted to draw a strong inference of recklessness. The
alleged misrepresentations regarding due diligence that form the basis of plaintiff's § 10(b) claim
occurred only once when the Group mailed the Hennessee Investor Presentation to South Cherry

22

sometime after August 2001. (Compl. ¶ 21.)

For all of these reasons, South Cherry has failed to plead scienter adequately, and its § 10(b) claim against Hennessee Group must be dismissed. Because South Cherry has failed to plead a primary violation of § 10(b), its § 20(a) claim against Elizabeth Lee Hennessee and Charles J. Gradante must also be dismissed.

## *B. Breach of Contract*

South Cherry's second cause of action alleges that Hennessee Group breached its contract with South Cherry by recommending (and continuing to recommend) Bayou Accredited as an investment without conducting both the initial and ongoing due diligence promised in the Hennessee Investor Presentation. (Compl. ¶¶ 44-50.) The Group moves to dismiss this claim because 1) South Cherry failed to alleged the essential terms of the alleged oral contract, and 2) the contract violates the Statute of Frauds, both because it is incapable of being performed within one year and because it constitutes "a contract to pay compensation for services rendered . . . in negotiating . . . a business opportunity . . . and partnership interest." N.Y. Gen. Obl. Law § 5-701(a)(10) (McKinney 2007).

Regardless of whether South Cherry has pled the essential terms of an oral contract, it is evident that the alleged contract is unenforceable under the Statute of Frauds. Under New York's Statute of Frauds, an agreement that by its terms cannot be performed within one year of its creation is void unless it is in writing. N.Y. Gen. Oblig. Law § 5-701(a)(1). In addition, "contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds." Computech Intern., Inc. v. Compaq Computer Corp., No. 02-CV-2628, 2002 WL 31398933, at *3 (S.D.N.Y. Oct. 24, 2002); see also United

Beer Distrib. Co., Inc. v. Hiram Walker (N.Y.) Inc., 557 N.Y.S.2d 336, 338 (1st Dep't 1990)

("Since the agreement called for performance for an indefinite duration and could only be

terminated within one year by its breach during that period, it is not one which by its terms could

be performed within one year.").

Here, all allegations regarding the alleged contract terms between South Cherry and

Hennessee Group occur in a single paragraph in the Complaint:

> Hennessee Group contracted with South Cherry that it would recommend to South
> Cherry suitable hedge fund investments which had passed every stage of
> Hennessee Group's detailed and rigorous five-step due diligence process. In
> addition, Hennessee Group promised South Cherry that it would continue to
> perform ongoing due diligence on investments South Cherry would make in
> reliance on Hennessee Group recommendations. In exchange, South Cherry agreed
> to pay Hennessee Group an annual commission of 1% of each hedge fund
> investment South Cherry made as a result of a Hennessee Group recommendation.

(Compl. ¶ 45.) By its pleaded terms, this is a contract of indefinite duration. No termination

provision, express or implied, is alleged.

The contract pleaded by South Cherry thus resembles the alleged oral contracts in United

Magazine Co. v. Murdoch Magazines Distribution, Inc., 146 F. Supp. 2d 385 (S.D.N.Y. 2001). In

United Magazine, plaintiff magazine wholesalers alleged oral contracts with defendant magazine

distributors, under which each wholesaler was "historically" granted "exclusive geographic

territories in which it alone sold publications to retailers." Id. at 392. Beginning in 1995,

defendant distributors began permitting some non-plaintiff wholesalers – including one of the

named defendants – to sell publications to retailers without regard to exclusive geographic

regions. Id. at 393. Plaintiffs claimed breach of its oral contract for the territory. The court held

that the Statute of Frauds voided these alleged contracts because the contracts were for indefinite

24

terms and, "Plaintiffs do not allege that their contracts with the Distributors contained express termination provisions, but only implied termination provisions. Since no express term was ever alleged, the contracts are for an indefinite duration and so not capable of performance within one year." Id. at 404; see also Burke v. Bevona, 866 F.2d 532, 538 (2d Cir. 1989) ("The New York cases uniformly hold that implied termination terms are not sufficient to take an oral contract out of the statute.").

South Cherry contends that the pleaded contract "is *capable* of being performed within one year" because "once South Cherry redeems or sells a Hennessee Group-recommended hedge fund – which it can do any time – it no longer owes Hennessee Group a commission." (Pl.'s Opp. Br. at 16.) (emphasis in original.) In support of this argument, South Cherry relies on Rosbach v. Industry Trading Co., Inc., for the proposition that "the Statute of Frauds will not act as a bar" to the enforcement of any contract that "may be fairly and reasonably interpreted such that it may be performed within a year." 81 F. Supp. 2d 522, 525 (S.D.N.Y. 2000).

Such reliance is misplaced, because plaintiff's interpretation of the pleaded contract is neither 'fair' nor 'reasonable.' The Complaint clearly pleads a single, overarching advisory agreement, pursuant to which Hennessee Group contracted to recommend hedge fund investments from time to time, in exchange for a 1% commission on each investment that South Cherry chose to make. (Compl. ¶ 45.) That is a classic example of a contract of indefinite duration.

Furthermore, if the alleged oral contract were terminated every time South Cherry sold all of its Hennessee Group-recommended hedge fund equity, then the contract would only be capable of being terminated within one year by South Cherry, not by Hennessee Group. "'Under New York law, however, if performance within one year depends upon an act solely within the control

25

of the party seeking to enforce the oral agreement, the Statute of Frauds remains applicable.'" Canet v. Gooch Ware Travelstead, 917 F. Supp. 969, 984 (E.D.N.Y. 1996) (quoting Zaitsev v. Salomon Brothers, Inc., 60 F.3d 1001, 1003 (2d Cir. 1995)).

For these reasons, the alleged oral contract is void under New York's Statute of Frauds, and South Cherry's breach of contract claim must be dismissed.

## C. *Breach of Fiduciary Duty*

South Cherry's third cause of action alleges that Hennessee Group breached its fiduciary duty as South Cherry's investment advisor. (Compl. ¶¶ 51-53.) The Group moves to dismiss this claim on the basis that it is preempted by the Martin Act, New York's blue sky law, which authorizes only the New York attorney general to enforce its provisions. (Def.'s Mot. to Dismiss at 21.) Plaintiff counters that this cause of action "is created by federal statute, the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 et seq.," and it "would be meaningless for an investment advisor to have fiduciary duties to individual customers, if the customers had no individual recourse for the breach of these duties." (Pl.'s Opp. Br. at 18-19.) Moreover, South Cherry contends that a recent Southern District of New York case, Louros v. Kreicas, 367 F. Supp. 2d 572 (S.D.N.Y. 2005), supports a finding that the Martin Act does not preempt plaintiff's claim.

To the extent that South Cherry is now attempting to frame its breach of fiduciary duty claim as a private cause of action based on the 1940 Act, that argument fails. It is well-settled that "no implied private right of action for damages exists under Section 206 of the Investment Advisers Act of 1940." In re Merrill Lynch & Co., Inc. Research Reports Secs. Litig., 272 F. Supp. 2d 243, 256 (S.D.N.Y. 2003) (citing Transamerica Mortgage Advisors, Inc. v. Lewis, 444

26

U.S. 11, 15-16, (1979)).[5] The Complaint seeks $1,150,000 in damages for the Group's breach of fiduciary duty. (Compl. at 24.) Therefore, the Complaint can only plead a claim under state law.

And unfortunately for South Cherry, its claim is indeed preempted by the Martin Act, which provides the New York Attorney General with the sole discretion to investigate securities violations within or from the state of New York. See N.Y. Gen. Bus. Law § 352(1) (McKinney 2007). No private right of action exists under the Martin Act, either. See CPC Int'l Inc. v. McKesson Corp., 70 N.Y.2d 268, 276-77 (N.Y. 1987).

Claims relating to "investment advice" have been deemed "activities within the Martin Act's purview," Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03-CV-3120, 2005 WL 1902780, at *21 (S.D.N.Y. Aug. 9, 2005), as are claims involving:

(a) . . . fraud, deception, concealment, suppression, false pretense . . . ;

(b) . . . promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c) . . . representation or statement which is false, where the person who made such representation or statement; (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made . . . .

N.Y. Gen. Bus. Law § 352-c(1).

The vast majority of state and federal courts have found that "causes of action related to a plaintiff's securities fraud claim that do not include scienter as an essential element are typically preempted by the Martin Act, in contrast to a claim requiring intent, such as a claim for common law fraud." Sedona Corp., 2005 WL 1902780, at *22; see also Dujardin v. Liberty Media Corp.,

---

[5] A "limited private remedy" for rescission does exist under Section 215(b) of the Act, see In re Bendelac, No. 03-10023, 2005 WL 3789126, at *15 n.5 (Bankr. S.D.N.Y. 2005), but South Cherry does not seek such a remedy.

359 F. Supp. 2d 337, 355 (S.D.N.Y. 2005) (noting that allowing plaintiff to proceed on claim that

lacked scienter element "would effectively permit a private action under the Martin Act, which the

New York State Court of Appeals had already determined would be impermissible."). According

to Judge Sand, the courts that have made this distinction

> have offered a persuasive justification for so doing: the latter two causes of action
> [for negligent misrepresentation and breach of fiduciary duty], like the Martin Act
> itself, do not require proof of deceitful intent; common law fraud, however, does.
> Courts concerned with preserving the Attorney General's exclusive domain
> therefore preclude claims which essentially mimic the Martin Act, but permit
> common law fraud claims, which require an additional element.

Nanopierce Techs., Inc. v. Southridge Capital Management LLC, No. 02-CV-0767, 2003 WL

22052894, at *4 (S.D.N.Y. Sept. 2, 2003); accord Castellano v. Young & Rubicam, Inc., 257 F.3d

171, 190 (2d Cir. 2001) ("sustaining a cause of action for breach of fiduciary duty in the context

of securities fraud would effectively permit a private action under the Martin Act, which would be

inconsistent with the Attorney-General's exclusive enforcement powers thereunder.") (citation

omitted); Joffee v. Lehman Bros., Inc., No. 04-CV-3507, 2005 WL 1492101, at *14 (S.D.N.Y.

June 23, 2005) ("Martin Act does not preclude private litigants from bringing common law fraud

claims because such claims require a plaintiff to prove intent or scienter . . . [C]ourts allow these

claims to proceed while simultaneously dismissing . . . breach of fiduciary duty claims.").

South Cherry relies exclusively on Louros v. Kreicas to support its contention that the

Martin Act does not preempt its breach of fiduciary duty claim. 367 F. Supp. 2d at 595-96. But

Louros is distinguishable from the instant case. In that case, plaintiff investor sued a trader who

was making investments on plaintiff's behalf, claiming § 10(b) violations in addition to several

state law claims. On defendant's motion for summary judgment, Judge Kaplan concluded that

28

plaintiff's breach of fiduciary duty claim was not preempted by the Martin Act because the claim did "not allege any kind of dishonesty or deception" and therefore did not "implicate[] . . . the plain language of the statute [ ]or its policies." Id. Because plaintiff's claim "simply alleges that [defendant] breached a fiduciary duty owed to [plaintiff] to manage his accounts in a way that comported with his needs and to keep him informed about the market and the trades in his account," the claim "does not allege deception, deliberate or otherwise. Accordingly, [the claim] does not come within the Martin Act, and it will not be dismissed." Id. at 596.

Unlike the claim in Louros, South Cherry's breach of fiduciary claim does allege deception. South Cherry claims Hennessee Group was dishonest when it represented that it would never recommend a hedge fund investment without first conducting due diligence, and then did precisely that. This allegation is part and parcel of plaintiff's claim (see Compl. ¶¶ 7-9, 51-52), and South Cherry's claim is therefore distinguishable from the claim discussed in Louros.

Moreover, I concur with the analysis set forth in Castellano, Nanopierce, and a host of other state and federal decisions finding breach of fiduciary duty claims arising in the securities context to be preempted by the Martin Act. This analysis is consistent with the statute's broad reach and purpose. See First Energy Leasing Corp. v. Attorney-General, 68 N.Y.2d 59, 64 (N.Y. 1986) ("the Martin Act should be liberally construed to give effect to its remedial purpose"); accord People v. Lexington Sixty-First Assocs., 38 N.Y.2d 588, 595 (N.Y. 1976). South Cherry has alleged that Hennessee Group has breached its fiduciary duties to plaintiff by not conducting sufficient due diligence either prior to or after recommending Bayou Accredited as an investment. The claim thus arises in the securities context, and the Complaint alleges "a substantial part of the events of omissions giving rise to this claim occurred in" New York. (Compl. ¶ 6; see Sedona

29

Corp., 2005 WL 1902780, at *21-22 (finding complaint's statement regarding proper venue in New York sufficient to establish Martin Act's geographical prong).) Accordingly, South Cherry's cause of action for breach of fiduciary duty is precluded by the Martin Act and must be dismissed.

### IV. Conclusion

For the foregoing reasons, defendants' motion to dismiss the amended Complaint is granted.

This constitutes the decision and order of the court.

Dated: July 31, 2007

_____
U.S.D.J.

BY FAX TO ALL COUNSEL

30